Bill B. WILLIAMS and Edna E. Williams,
Appellants,

v.

Myrtle C. DeLAY and Westley H. Gregory,
Appellees.

No. 466.

Supreme Court of Alaska.

Dec. 4, 1964.

Bailey E. Bell, Anchorage, for appellant.
No appearance for appellee.

Before NESBETT, C. J., and DIMOND and AREND, Justices.

AREND, Justice.

The appellees, Myrtle DeLay and Westley Gregory, who are related as mother and son, brought this action in the superior court to compel the appellants Bill Williams and Edna Williams, husband and wife, to specifically perform a contract for the sale of certain real property to them by the appellants. The appellees also prayed for possession of the property and damages for wrongful dispossession. In support of their prayer for relief, they alleged, among other things, that under the terms of the contract they were required to make a down payment of $7,500 and monthly payments of $150 until payment in full of the total purchase price of $33,000; and that, at the time of filing their complaint on December 23, 1960, they had paid $17,550 to the appellees on the contract, leaving an unpaid balance then of $19,366. They also alleged that they had substantially improved the property and that they had performed all of their obligations under the contract.

The appellants in their answer denied that the appellees had performed their obligations under the contract and alleged

that the appellees were in default for violating the terms of the contract in the following respects: (1) They had failed to make the required down payment of $7,500. (2) On April 25, 1959, the appellee, Myrtle DeLay, had assigned her interest in the contract without the consent of the appellants. (3) The appellees had failed or neglected to keep in force good and sufficient insurance on the property. (4) On August 27, 1957, they had given an oil and gas mineral lease on the property to Standard Oil Company of California. (5) They removed from the property a quonset hut valued at $1,000. (6) They permitted to be removed from the property a rental cabin worth $2,000. (7) The appellee, Westley Gregory, permitted the City National Bank of Anchorage to take judgment against him and to levy upon an electric power plant, thus depreciating the value of the property. (8) The appellees permitted a labor lien for $335 to be placed against the property. And (9) they set up an Alaskan corporation, Naptowne, Incorporated, with representations that the corporation owned the property, and the appellee, Westley Gregory, then sold a considerable amount of stock in the corporation, in particular, stock certificate No. 11, to John Handley.

The appellants also alleged in their answer that they gave to the appellees the thirty-day notice to comply with the terms of the contract as required by the contract; that, upon failure of the appellees to perform, the appellants rescinded the contract and went into peaceable possession of the premises; that the contract should be construed as a mortgage and the appellants be treated as mortgagees in possession, requiring that the appellees in order to regain possession tender the total amount due plus any damages done by them to the property. They asked the court for judgment quieting their title to the property and for damages suffered by them by reason of the alleged wrongful acts of the appellees.[1]

The evidentiary facts of the case are fairly summarized in the memorandum opinion of the trial judge as follows: On April 11, 1955, the Williamses as sellers entered into a real estate contract with Peter Pomeroy, Glenn Hall and Robert Gregory, buyers. The property involved consisted of 122 acres, more or less. Improvements on the land consisted of the Naptowne Inn which was equipped as a restaurant for serving food and drink to the public, and some quonset huts or cabins. The purchase price was $33,000, of which amount $7,500 was required immediately as a down payment and the balance to be paid in monthly installments of $150 commencing June 1, 1955, inclusive of interest at the rate of three per cent per annum on the decreasing principal.

The contract also provided for (1) possession of the property by the buyers for as long as they should not be in default under the contract; (2) maintenance of the premises in good condition and without any commission or allowance of waste by the buyers; (3) assignment by the buyers of their interest in the contract only with the written consent of the sellers; (4) insurance of the premises by the buyers in a sum of not less than $5,000, payable to the parties in case of loss as their interests might appear and, in case of partial loss by fire, use by the buyers of proceeds from the insurance policy for the purpose of restoring the building on the premises to substantially the same condition it was in prior to the fire; (5) right in the sellers to declare a forfeiture of the contract and to retain as liquidated damages all payments made by the buyers in the event of any default by the buyers; and (6) a thirty-day written notice by the sellers to the buyers, in the event of the exercise by the buyers of

1. W. H. Gresham and Lea J. Gresham were also named in the complaint as defendants by virtue of the fact that they were occupying the property as tenants of the appellants at the time suit was started. The Greshams answered denying that they were in any way responsible to the appellees and adopting the material allegations made in the Williamses' answer.

their option to declare a forfeiture, specifying the particulars in which the buyers were in default and granting them thirty days in which to correct or remove any defaults charged against them. The contract was escrowed at the National Bank of Alaska.

In the latter part of 1955 the appellant, Westley Gregory, joined his brother Robert and the other two buyers of the property at the Naptowne Inn. For a time the four men lived together on the premises doing certain finishing work on the restaurant. In this connection they sheetrocked and paneled the walls, installed a counter and grill, and laid carpet preparatory to opening up for business.

Westley Gregory loaned his brother Robert $500 for the purchase of a liquor license for the restaurant and $500 for materials. In all, Robert purchased about $4,000 worth of materials for the restaurant. Later in the year he was fatally injured in a hunting accident on the premises. After Robert's death, the appellant, Westley Gregory, was appointed administrator of his brother's estate. On March 3, 1956, the buyers Pomeroy and Hall, with the consent of the sellers, assigned their interest in the property to the appellant, Myrtle DeLay.

In February, March and April of 1956, Westley Gregory and one J. R. Nielson added an enclosed porch to the restaurant, placed the floor covering and finished out the walls. On June 1, 1956, Nielson and his wife took a five-year lease to the property from Gregory acting as agent for his mother, Myrtle DeLay.[2] The Nielsons built a formica counter for the restaurant, with eight to twelve stools. The kitchen was furnished in marlite and vinyl tile. Several of the quonset huts were wired, insulated and painted, and one of the huts was equipped with plumbing fixtures for a washroom and a shower. An airstrip was also constructed over a portion of the property back of the restaurant.

On October 21, 1958, the Nielsons gave a bill of sale to certain personal property used in the restaurant to Mr. and Mrs. Donald Archer and Mr. and Mrs. W. H. Gresham. Four days later Westley Gregory, as lessor,[3] leased the property to the Archers and Greshams for five years, with an option to renew for an additional three years and a first option to buy in the event of sale of the property by the lessor. The lessees were required, under the lease, to pay a monthly rental of $150 to the National Bank of Alaska on the Williams escrow and to keep the premises insured. The Greshams later bought out the Archer interests and as lessees in possession continued to make the rental payments to the bank until January 1960.

On August 27, 1957, Westley Gregory, as administrator of Robert Gregory's estate, gave an oil, gas and mineral lease of the property to Standard Oil Company of California. The lease was for a period of five years and so long thereafter as oil, gas, hydrocarbons or minerals were produced from the land or so long as Standard Oil was engaged in drilling, mining or reworking operations.

One Saunders filed a mechanics lien against the property on May 26, 1960, for work he did, at Gresham's request, on the restaurant building after it had been struck by a truck. The insurance company apparently paid for the work by issuing a check to Westley Gregory who applied the money elsewhere and thus occasioned the filing of the labor lien. However, the lien was never foreclosed as the claim was paid about two months after completion of the work.

---

2. The trial court found that the lease to the Nielsons contained no option to buy as suggested by the Williamses.

3. On June 27, 1958, the appellee, Myrtle DeLay, undertook to make an assignment of her interest in the estate of Robert Gregory to her son, Westley Gregory.

On October 19, 1956, the appellee, Westley Gregory, gave an easement to the Government for highway purposes, and the following year he gave a right-of-way easement to the Homer Electric Association for the construction of a distribution system. In August of 1955, the First National Bank of Anchorage had taken a judgment against Westley Gregory and executed on the light plant on the subject property. However, on December 1, 1957, the bank gave Westley a bill of sale to the light plant and a satisfaction of the judgment.

During 1956–1957, Westley Gregory carried on negotiations with the District Engineer, Bureau of Public Roads, relative to selling some of the gravel off the premises. Some proof was offered that he opened a gravel pit and attempted to sell some gravel to the Bureau of Public Roads, but this he denied doing. On May 18, 1958, Gregory organized Naptowne, Incorporated, as a corporation ostensibly for the purpose of perhaps subdividing the property or selling interests therein.

At various times during which Westley Gregory had leased the property to the Nielsons and later to the Greshams, there had been defaults in keeping the property insured in accordance with the provisions of the contract. On one occasion Gregory had permitted one of the quonset huts to be removed from the premises and placed on adjoining property.

On April 23, 1959, Myrtle DeLay assigned her interest in the real estate contract to Westley Gregory and executed a quitclaim deed for the property in question, designating Gregory as the grantee. Gregory subsequently filed these two documents with the escrow at the bank.

Such was the situation when on October 31, 1959, the appellant, Bill Williams, addressed a written notice of default to Westley Gregory at Sterling, Alaska, and to Myrtle DeLay at Fresno, California. The defaults listed in the notice were as follows: (1) Sale of the electric power plant at a marshal's sale; (2) purported lease of a portion of the premises to the Greshams and the Archers; (3) purported lease of a portion of the premises to Standard Oil Company of California; (4) lease of the premises to the Nielsons; (5) removal of a quonset hut from the premises; and (6) "that certain portions of the property listed under the Sales Contract have been sold or are being sold under contract." The notice informed the appellees that they must comply with paragraph nine of the real estate contract which provided for declaration by the sellers of a forfeiture of the contract for failure of the buyers to correct or remove defaults in the performance of the terms of the contract within thirty days after notice given of the "particulars in which Buyers are in default. * * *"[4]

---

4. Following is the full text of the forfeiture clause of the real estate contract under consideration:

"9. *FORFEITURE:* In the event of the failure by the Buyers to pay any installment of the purchase price as the same shall become due hereunder, or in case the Buyers shall fail or refuse to keep and perform any of the other terms and conditions of this agreement according to the tenor thereof, then it shall be optional with the Sellers to declare a forfeiture of this agreement, as hereinafter provided and Buyers shall thereby forfeit to the Sellers, as liquidated damages, all payments theretofore made, and Sellers shall be relieved of any obligation, either at law or in equity, to convey said premises to Buyers, provided that Sellers shall, in exercising the option to forfeit said agreement, give Buyers Thirty (30) days written notice specifying the particulars in which Buyers are in default, and Buyers shall have Thirty (30) days in which to correct or remove any defaults thus complained of, and said written notice shall be deemed as having been given when deposited in the mail, postage prepaid, and registered to Buyers at Box 558, Anchorage, Alaska, or such other address as Buyers may leave with the escrow holder."

Westley Gregory did not immediately receive the notice of default mailed to him, and so he did not correct any existing defaults within the time allowed under the contract and the notice. In the meantime the Greshams continued to make their payments on the escrow at the National Bank of Alaska until January of 1960. Evidently when the payment due February 1, 1960, was not made by the Greshams, the bank notified Myrtle DeLay of this fact. On February 29, 1960, Westley Gregory tendered $300 to the bank to cover the February and March payments. The bank held the money but did not apply it on the contract, reporting to Gregory that it had been informed that the Williamses would accept no further payments on the purchase price.

The balance owing on the contract as of January 7, 1960, was $20,366.49. Westley Gregory continued to make monthly payments to the bank until the commencement of the trial—November 30, 1961. At that time, if the bank had applied the payments to the contract, there would have remained due on the purchase price the sum of $18,012.50 and the contract would have been current through December 1960.

After the notice of default had been given, the Williamses retook possession of the property. On January 29, 1960, they leased it to the Greshams and on November 13, 1961, entered into a so-called "Conditional Sales Contract" with the Greshams to sell to the latter 2.173 acres of the subject property, with certain improvements for the sum of $28,000, payable $3,500 in cash as a down payment and the balance in monthly installments.

The trial court noted in its memorandum decision that on October 14, 1960, the superior court approved the final account of Westley Gregory as administrator of his brother Robert's estate and ordered the residue of the estate to be distributed to and become the property of Westley Gregory.[5] The court also noted that the following claims of breach, relied upon either in the pleadings or at the trial, were not included in the notice of default given by the Williamses on October 31, 1959: (1) Failure to make the $7,500 down payment;[6] (2) assignment by Myrtle DeLay of her interest in the contract; (3) failure to keep the property insured; (4) removal of the quonset hut; (5) the mechanic's lien filed by Saunders; (6) the sale of a Naptowne Corporation stock certificate; and (7) the marshal's sale of the electric power plant.

With respect to the foregoing items (4) through (7) the trial court stated in its memorandum decision:

"So far as I can ascertain, these items * * * are claimed as default under paragraph 5 [which prohibits the commission or allowance of any waste of the premises] of the real estate contract. Specifically, it is claimed that * * * at least some of these items amount to waste or failure to keep the premises in good condition. * * * The general criteria by which to determine whether waste has been committed is to ascertain whether lasting damage has been done to the inheritance or its value depreciated. Compton v. Cook [259 Ala. 256], 66 So.2d 176. In this case, I find the property to have been substantially improved by

5. The decree settling the final account of the estate of Robert Gregory describes the identical property mentioned in the real estate contract of April 11, 1955. The decree also states that the decedent had an undivided one-third interest in the contract; that the decedent's mother, Myrtle DeLay, was his sole heir and entitled to his estate; and that Myrtle DeLay had assigned her interest in the estate to her son, Westley Gregory,

by instrument dated June 27, 1958, and filed in the estate.

6. In its memorandum opinion the trial court stated that the claim of breach for failure to make the down payment was not proved at the trial and that "it would be considered extremely improbable that from the time of the execution of the real estate contract on the 11th of April, 1955, until the time the pleadings were filed [1960–1961] that no claim would be made for this sum."

Gregory or by his tenants. Moreover, I take judicial· notice that the value of the property has greatly appreciated because of its favorable location to the oil fields on the Kenai Peninsula. The amount of appreciation is reflected by the so-called 'conditional sales contract' entered into by the defendants Williams, with the defendants Greshams. * * * "

In its formal findings of fact the trial court found that the ·leases by Westley Gregory to ·the Nielsons, to the Greshams and Archers and to Standard Oil Company, as well as the assignment and quitclaim deed by Myrtle DeLay to Westley Gregory and the failure to keep insurance on the property at all times, did in fact constitute defaults by the appellees under the contract. As to the other breaches of the contract claimed, the court found that they did not constitute defaults or waste of the property. The final finding made by the trial court was that as of the time of trial the appellees had acquired a substantial equitable interest in the subject property and had paid substantial sums on the contract. In connection with this finding the court stated that it was taking judicial notice of the fact that the real property in question had appreciated greatly in value from the time the 1955 contract had been executed as evidenced by the more recent sale of 2.173 acres of the property by the Williamses to the Greshams for $28,000.

From the findings thus made, the trial court arrived at the following conclusions of law, among others:

(1) That in the exercise of the court's discretion, the interest acquired by the appellees as buyers and the monies theretofore paid by them should not be summarily foreclosed and forfeited, and that the forfeiture provisions in the contract should not be literally applied but that the appellees should be granted an opportunity to redeem their interest by paying to the Williamses within six months from the date of the judgment in this case all sums remaining due under the contract.

(2) That, in the event the right of redemption so provided should not be exercised within the period stated, "the Court will order the property sold at public sale and will then order that the proceeds of such sale be applied in the manner following: first expense of such sale, then to the balance due on the said contract, and the remainder, if any, to plaintiff [appellee] DeLay."

(3) That, in the event the appellees do redeem the property as provided in paragraph (1) above, then the Williamses shall account to the appellees for all income received by them from the premises from January 1, 1960, until the date of redemption.

(4) That the case should be referred to a master for a hearing and determination of the precise amount of income realized by the Williamses, such income to be applied toward a reduction of the contract balance due.

On January 18, 1963, the court entered judgment in conformity with its conclusions of law, and on March 26, 1963, the appellee, Myrtle DeLay, gave notice of her intention to redeem and moved for an order of reference to a master. In the meantime, it appears that the parties had thought they might be able to reach an agreement as to the amount remaining due under the contract. In this they failed, however, because the Williamses were now claiming that $4,200 plus accumulated interest in the sum of $1,008, remained due on the $7,500 down payment and that the appellees owed them $14,684.64 for cash expenditures they had to make as a result of their having to retake possession of the property after default by the appellees. Evidence was received by the trial court on the issues thus raised and in a memorandum decision entered on September 4, 1963, the court disallowed all of the items claimed.

Three weeks later the court referred the case to a special master to determine (1) the amount of income received by the appellants during the time they had possession of the premises, and (2) the balance remaining

due on the contract.[7] The report of the special master, dated and filed on December 6, 1963, showed a principal balance of $17,-250.95, inclusive of contract interest at three per cent through December 9, 1963, due on the contract, from which amount the sum of $16,675 was required to be deducted as rental income received by the Williamses to date while in possession, leaving a balance of $575.95 to be paid by the appellees on December 9, 1963, in order to completely pay up the contract.

On December 17, 1963, the trial court entered a "Supplemental Order" approving the special master's report and ordering that "at any time within 6 months from date hereof, plaintiff DeLay may redeem her interest in the real property which is the subject matter of this action by tendering to defendants Williams the sum of $575.95, plus an additional increment of $1.395 for every day elapsing between the 9th day of December, 1963, and the date of tender." On the same day that this order was entered, counsel for the appellee, Myrtle De-Lay, tendered into court for the benefit of the Williamses the cash sum of $588.51,

representing the $575.95 mentioned in the order, plus interest for the days December 9–17, inclusive, 1963.

Finally, on January 3, 1964, the trial court entered a "Money Judgment," awarding to the appellee, Myrtle DeLay, an attorney's fee of $1,750 and costs in the sum of $120.30. The Williamses have appealed from the judgment and in their brief on appeal specify twenty-three errors alleged to have been committed by the trial court. The first eleven errors specified in one form or another charge that certain findings made by the court were not supported by the evidence.[8] We have carefully examined all of the evidence in this case, oral and documentary, and are convinced that there is no clear error in the findings challenged by the appellants.[9]

Six of the remaining specifications of error relate to points of law arising out of the defaults under the contract alleged by the appellants to have been committed by the appellees. These specifications of error are set forth in the margin.[10] They are

7. The order of reference to a special master, contained this concluding paragraph: "For the reasons set forth in said written memorandum [of September 4, 1963], IT IS FURTHER ORDERED that the claims asserted by defendants Williams against plaintiffs, totaling the sum of $19,892.64, should be, and they hereby are, disallowed."

8. The appellants attack one finding of fact (No. 24) as being a conclusion of law and as being contrary to the law; but they have not discussed this error in the argument portion of their brief and therefore we need not consider it. See Parks v. Brown, 368 P.2d 220 (Alaska 1962).

9. Civil Rule 52(a) provides in part that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

10. The six specifications of error treated in this portion of the opinion are set forth in the appellants' brief as follows: "(Spec. No. 12) That the court erred in Conclusion of Law No. 2, for the rea-

son that the defaults complained of by the defendants were valid breaches and defaults under the real estate contract, in addition to the defaults and breaches found by the court.

"(Spec. No. 13) That the court erred in Conclusion of Law No. 4, since the conclusion is clearly contrary to the evidence and to the law, and the court, in particular, erred in permitting the breaches and defaults to be summarily disposed of.

"(Spec. No. 14) That the court erred in Conclusion of Law No. 5 authorizing the purchasers to redeem their interest in the property by payment within six months."

"(Spec. No. 17) That the court erred in entering judgment authorizing the plaintiffs to redeem property involved in the litigation herein since such determination is contrary to the law in that the court found the plaintiffs to be in default, yet authorized redemption, contrary to the terms of the contract."

"(Spec. No. 19) That the court erred in failing to give full force and effect to the contract entered by the parties herein."

treated conjointly in the brief of the appellants in connection with their argument that for the lower court to order specific performance of the contract instead of giving legal effect to the forfeiture clause contained in the contract, was contrary to law. They rely upon a line of cases from other jurisdictions which hold that specific performance of a contract will not be granted when it is not mutually enforceable, i. e., when the one seeking its enforcement could not be compelled to perform [11] and that, where parties under no disabilities choose to contract for a forfeiture, there can be no relief from the forfeiture in the absence of fraud or improper practice on the part of the person seeking to impose the forfeiture.[12]

The foregoing may be acceptable principles of law in their place, but in Alaska we are committed to the rule announced in our decision in the case of Land Development, Inc. v. Padgett [13] that the trial court may refuse to enforce literally the forfeiture provisions of a real estate contract, for this is a matter of discretion which is directly related to the equities of the situation.[14] Looking to the equities in this case, we find a contract for the purchase of real property under which the buyers made a cash down payment of $7,500, nearly a fourth of the total purchase price. Additionally they had made quite regular monthly payments of $150 each on the balance of principal and interest. These payments were either received by the sellers or made available to them at all times and, when added to the rental income received by the sellers after they had given notice of default and retaken possession of the property, left an unpaid balance of only $575.95 owing on the purchase price. This balance was tendered into court by the buyers almost immediately after it had been ascertained by the special master. Furthermore, the buyers had made valuable improvements upon the property and the property had appreciated considerably in value after the execution of the contract.

Taking into consideration all of the foregoing factors, we are of the opinion that it would be inequitable in this case to enforce the forfeiture provision of the contract. To quote an applicable statement from Land Development, Inc. v. Padgett, enforcement of the forfeiture "would cause a loss to the buyers all out of proportion to any injury that might be sustained by the seller." [15]

We find no error in the refusal of the trial court to decree a forfeiture in this case and affirm the course it followed and the decision at which it arrived. While the allowance of a six-month grace period to the purchasers within which to pay the small balance found owing on the contract seems unnecessarily long, it did not result

"(Spec. No. 22) That the court erred in failing to quiet the title to defendants' property and ordering the property returned to defendants."

11. Some of the cases discussed by the appellants on the subject of mutuality of remedy in the granting of specific performance are Rutland Marble Co. v. Ripley, 10 Wall. 339, 359, 77 U.S. 339, 359, 19 L.Ed. 955, 962 (1870); Lind v. Baker, 48 Cal.App.2d 234, 119 P.2d 806 (1941); Jacksonville Hotel Bldg. Corp. v. Dunlap Hotel Co., 350 Ill. 451, 183 N.E. 397 (1932); Alworth v. Seymour, 42 Minn. 526, 44 N.W. 1030 (1890).

12. Cases relied upon by the appellants in which forfeiture clauses contained in contracts were enforced are: Glock v. Howard & Wilson Colony Co., 123 Cal. 1, 55 P. 713, 43 L.R.A. 199 (1898); Bishop v. Beecher, 67 N.M. 339, 355 P.2d 277 (1960); Johnson v. Feskens, 146 Or. 657, 31 P.2d 667, 107 A.L.R. 340 (1934); Thiel v. Miller, 122 Wash. 52, 209 P. 1081, 26 A.L.R. 523 (1922); Barrett v. Bartlett, 189 Wash. 482, 65 P.2d 1279 (1937).

13. 369 P.2d 888 (Alaska 1962).

14. The trial court took note in its memorandum opinion of our decision in Land Development, Inc. v. Padgett and acted accordingly.

15. 369 P.2d 888, 889 (Alaska 1962).

in any prejudice to the sellers, since it was tendered into court forthwith.

On the last page and a half of their brief the appellants set forth three additional specifications of error, but they fail to support the errors specified by any clear explanation and argument or by any citation to authorities. We need not consider such specifications of error.[16]

Affirmed.

---

16. See Watts v. Seward School Bd., Opinion No. 251, 395 P.2d 372 (Alaska 1964); Veal v. Newlin, Inc., 367 P.2d 155 (Alaska 1961).