**CITY OF VALDEZ, Appellant,**

v.

**VALDEZ DEVELOPMENT COMPANY, a partnership consisting of Jerry J. McCutcheon, et al., Appellees.**

**VALDEZ DEVELOPMENT COMPANY, a partnership consisting of Jerry J. McCutcheon, et al., Cross-Appellants,**

v.

**CITY OF VALDEZ, Cross-Appellee.**

Nos. 1905, 1922.

Supreme Court of Alaska.

June 5, 1974.

---

Kenneth P. Jacobus, Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellant and cross-appellee.

Charles K. Cranston, Anchorage, for appellees and cross-appellants.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, and FITZGERALD, JJ.

## OPINION

**RABINOWITZ, Chief Justice.**

The issues in this appeal arise from a contract for the sale of realty which was entered into between the city of Valdez and the Valdez Development Company.

In carrying out an Urban Renewal Project under the auspices of the Alaska State Housing Authority, the city of Valdez accepted bids on 40 lots from Valdez Development and then sold to the company 36 lots. In May of 1969 the city executed contracts for the 36 lots which contained stipulations providing as to when Valdez Development had to submit a development plan and further providing a completion deadline for construction. The four additional lots bid upon at this time were claimed by the city to have been previously sold, and they form another part of this litigation.

Valdez Development later placed bids on 15 more lots which the city accepted, subject to the determination that no conflict existed. Subsequently, when the city determined that the lots had been previously sold, Valdez Development was notified that the bids were rejected. Asserting it was defrauded, Valdez Development filed a complaint alleging the wrongful withholding of contracts for the 15 lots in question.[1] City of Valdez counterclaimed requesting the immediate forfeiture of the 36 lots previously conveyed by the city to Valdez Development, alleging bad faith and anticipatory breach by Valdez Development.

Valdez Development then filed a separate complaint in which it alleged it had been damaged by the city's counterclaim. More specifically, Valdez Development alleged that the counterclaim constituted a cloud on its titles, prevented it from obtaining financing, and constituted an act of malicious prosecution on the part of the city. The counterclaim was eventually dismissed without prejudice in January of 1970, but by this time the weather made construction in Valdez impossible. Construction of the Trans-Alaska pipeline was enjoined in April of 1970, prior to the next construction season, as a result of which the housing market in Valdez was destroyed, financing became unavailable again, and construction by Valdez Development was further delayed. In December of 1971 the city moved to have title to the 36 lots revested in it due to the company's failure to meet its contractual construction deadlines. Trial was held on the city's suit to foreclose and Valdez Development's suit for malicious prosecution. The superior court refused to grant the city of Valdez

---

1. Valdez Development agreed to dismiss the question of these 15 lots from this suit at the time of trial.

foreclosure, extended the construction deadlines, and denied Valdez Development damages for malicious prosecution. In addition, the lower court ordered the city to convey to Valdez Development the last four lots of the original 40 lots bid upon by Valdez Development as the city had now regained title to these lots. Neither party was awarded attorney's fees. Both parties have appealed from the superior court's judgment.

We first reach the city of Valdez's assertion that it was error for the superior court to deny it foreclosure as to 33 of the original 40 lots.[2] It is undisputed that construction on these lots was not commenced or completed within the contractual deadline. Nevertheless, the superior court held that Valdez Development's performance was excused.

Throughout this litigation Valdez Development has contended that the delay in its performance is excused under Section 707 of its contract with the city of Valdez, which reads as follows:

> For the purposes of any of the provisions of the agreement, neither the Agency nor the Redeveloper, as the case may be, nor any successor in interest, shall be considered in breach of, or default in, its obligations with respect to the preparation of the Property for redevelopment, or the beginning and completion of construction of the Improvements, or progress in respect thereto, in the *event of enforced delay* in *the performance of such obligations due to unforeseeable causes beyond its control and without its fault or negligence, including, but not restricted to,* act of God, acts of the public enemy, *acts of the Federal Government,* acts of the other party, fires, floods, epidemics, quarantine restrictions, *strikes, freight embargoes,* and unusually severe weather or delays of subcontractors due to such causes; it being the purpose and intent of this provision that in the event of the occurrence of *any such enforced delay, the time or times for performance* of the obligations of the Agency with respect to the preparation of the Property for redevelopment or of the Redeveloper with respect to construction of the Improvements, as the case may be, *shall be extended for the period of the enforced delay as determined by the Agency: Provided,* That the party seeking the benefit of the provisions of this Section shall, within ten (10) days after the beginning of any such enforced delay, have first notified the other party thereof in writing, and of the cause or causes thereof, and *requested an extension for the period of the enforced delay.* (emphasis added)

More specifically, it is Valdez Development's contention that the period for which the federal district court's injunction prohibiting the Secretary of the Interior from issuing a permit for construction of the Trans-Alaska pipeline was in effect constitutes a period of enforced delay under the provisions of Section 707.[3]

The city of Valdez responds to this contention by arguing that Section 707 contains no language which would justify characterization of non-issuance of the pipeline permit as an enforced delay, that Section 707 simply does not provide for such a contingency. The city argues that it wanted housing constructed regardless of

---

**2.** Three lots of the original bid are no longer in dispute because Valdez Development has since completed some construction on those lots. The remaining four lots are the subject of another aspect of the city's appeal.

**3.** In its brief Valdez Development characterizes Section 707 as a contractual recognition of the doctrine of impossibility or commercial frustration of contracts. The doctrine of impossibility has been recognized by this court in Merl F. Thomas Sons, Inc. v. State, 396 P.2d 76 (Alaska 1964), and more recently in Northern Corp. v. Chugach Elec. Ass'n, 518 P.2d 76 (Alaska 1974). The usual remedy when impossibility of performance is demonstrated by a party to a contract is rescission of that contract. Section 707 however provides for a contractual remedy of extending the time for performance when timely performance is rendered temporarily impossible under the terms of the section.

whether the Trans-Alaska pipeline permit was issued.

The superior court agreed with the contention of Valdez Development. The lower court noted that in 1969, at the time the contract was formed, commencement of construction of the Trans-Alaska pipeline was believed to be imminent. It was anticipated that the start of pipeline construction would bring approximately 100 new families to Valdez for whom there was no available housing. Subsequently, the federal injunction barring pipeline construction was issued, thereby destroying this potential market for new housing and making it virtually impossible for any company to obtain financing for construction.[4] The superior court considered these facts and concluded that Section 707 was intended to excuse a delay in timely performance of the contract resulting from

> acts of the federal government, acts of the other party, and other emergency type matters or exigencies which could not reasonably have been anticipated as to the specific occurrence thereof. I feel that Judge Hart's decision [enjoining the construction of the pipeline] falls within the category that was contemplated by the parties at the time. . . .

Section 707 provides, as stated above, that timely performance will be excused due to enforced delays resulting from such causes "including, but not restricted to . . . acts of the federal government . . . strikes . . . embargoes . . . ." The purpose of this section is to provide extensions of construction deadlines when enforced delays make construction impossible. The section lists events, the occurrence of which are not attributable to any fault or shortcoming of the developer and which would prevent any developer from timely compliance with the contract provisions.[5]

The specific clause in Section 707 referring to acts of the federal government by the plain meaning of its language includes judicial injunctions.[6] However, decisions that we have discovered which excuse performance under a contract on this ground generally involved situations in which the injunction or judicial order itself is the direct cause of the delay in performance.[7] The district court's injunction did not directly prohibit housing construction in Valdez, and so the injunction standing alone would not excuse timely performance by Valdez Development under Section 707.

While the clause referring to acts of the federal government does not seem to directly apply to the circumstances of the case at bar, we think that the

---

4. The financing required by Valdez Development was stated to be $1,200,000 and was shown at trial to be impossible to obtain following issuance of the federal injunction.

5. Sections 704 and 705 of the contract between the city of Valdez and Valdez Development provide for a system of revestiture of title in the city followed by resale to a second developer should Valdez Development default in its construction obligation. The sections are founded on the premise that while the individual developer may be in default there are other developers who are able to step in and continue the construction agreement. Section 707, on the other hand, is concerned with those situations in which there is an enforced delay which is not attributable to the particular developer, and which generally precludes development by any developer for the period of the delay.

6. An act of a federal court is also an act of the federal government. The Restatement of Contracts § 458 (1932) provides in part:

> A contractual duty or a duty to make compensation is discharged, in the absence of circumstance showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently *prevented or prohibited* . . . (b) *by a judicial, executive or administrative order* made with due authority by a judge or other officer of the United States. . . . (emphasis added)

Section 458 is, of course, addressed to the issue of impossibility of performance of a contract. The relationship between the impossibility doctrine and Section 707 is discussed *supra* at note 3.

7. *See, e. g.,* Kuhl v. School Dist. No. 76 of Wayne County, 155 Neb. 357, 51 N.W.2d 746 (1952) (teacher's contract followed by an injunction prohibiting operation of school).

present circumstances are encompassed by the "including, but not restricted to" general language of Section 707.[8] The federal injunction did prevent construction of the Trans-Alaska pipeline, which in turn made the securing of financing to construct housing in Valdez impossible. With financing unavailable, Valdez Development was unable to comply with the time requirements in the contract. In terms of causation, the federal injunction issued by Judge Hart can be viewed as both an actual and a proximate cause of Valdez Development's failure to comply with the contract. The situation is similar in type to the effect of a strike or an embargo which prevents the acquisition of labor or materials for construction. It is also similar in type to a direct judicial order prohibiting construction in Valdez. In each of the enumerated situations there is an unanticipated enforced delay whose cause is not attributable to any fault of the developer. In each situation construction would be effectively impossible for any developer for the duration of the strike, embargo, judicial order, etc. We therefore affirm the superior court's determination that the periods of enforced delay provided for in Section 707 encompass the circumstances found to exist in the case at bar.[9]

The city further argues that Valdez Development is barred from relying on Section 707 to excuse performance during the period that the injunction was in force because it failed to give the city the required written notice within 10 days.[10]

The city does not dispute that it had actual knowledge of the pipeline injunction, but asserts that it did not have knowledge of the consequences that the injunction had for Valdez Development, and that in any case Section 707 requires formal written notice. The superior court found from all the circumstances that the city was put on notice that one effect of the injunction prohibiting pipeline construction was to render impossible the attainment of financing by potential developers in the Valdez area. Numerous other developers who obtained land in 1969 to participate in the Valdez urban development program were unable to meet the construction deadlines, and no construction took place on other lands owned by the city during the period the injunction was in effect. A representative of the Alaska State Housing Authority testified that after issuance of the injunction, it became impossible for developers to obtain financing for construction of facilities in Valdez. We find that the superior court was not clearly erroneous in determining that the economic impact of the pipeline injunction on the city of Valdez was readily apparent without specific notice. With regard to the requirement of formal notice, we note that the purpose of the notice provision was to insure that the city knew of the delay and did not continue to rely on their expectations that the housing would be completed. Once notified, the city could go to court to seek some action if the delay seemed unjustifiable. The city did know of the construction

8. When interpreting general words that are followed by a description of specified subjects, the meaning of the general words is limited to the enumerated special subjects and those things of the same nature. State Farm Fire & Cas. Co. v. Rowland, 111 Ga.App. 743, 143 S.E.2d 193, 196 (1965).

9. The city of Valdez attempts to refute the finding that Section 707 was meant to excuse delay resulting from the failure of the pipeline to be constructed by demonstrating that it had specifically excluded a clause providing for such an excuse in a contract with another developer. However, evidence of the city's intent in dealing with third parties does not re-

quire the trial court to find that the intent was the same in the contract between the city and Valdez Development. See McCormick Evidence § 198 (2d ed. 1962); McKee v. State, 172 Cal.App.2d 560, 342 P.2d 951, 957–958 (1959).

10. Section 707 contains a provision that:
The party seeking the benefit of the provisions of this section shall, within 10 days after the beginning of any such enforced delay, have first notified the other party thereof in writing, and of the cause or causes thereof, and request an extension for the period of the enforced delay.

delay without formal notice, and there is no evidence that it was in any way prejudiced by the failure to receive formal notice. We agree with the trial court that this combination of actual notice and lack of prejudice to the city excused Section 707's requirement of written notice.

■ Furthermore, in determining whether or not to enforce a forfeiture clause, the superior court correctly considered equitable principles. The ultimate aim of the proceedings in equity is to save the respective parties harmless from loss or damage and to permit them each to have the benefit of their bargains entered into voluntarily.[11] As we pointed out in Moran v. Holman,[12] this court has not propounded a purely quantitative rule in determining when to invoke forfeiture, but instead a rule that allows for consideration of whether compensation can be made and the forfeiture discharged.[13] In this case both the city and the company will be able to obtain the benefits of the housing construction that was the subject of the bargain. The trial court interpreted Section 707 to provide for a reasonable delay. After examining the circumstances at the time of trial, it was determined that the Trans-Alaska pipeline permit was likely to be granted in the near future, and construction could then commence. The court set an absolute deadline for commencement of housing construction in order to avoid open-endedness.[14] The trial court's decision was stated to be without prejudice should any subsequent events arise which would indicate the city's interests were being jeopardized. The city could foreclose if Valdez Development declined to proceed at all upon the project. We hold that the superior court's refusal to grant forfeiture

and its decision to extend the contract construction deadlines was not erroneous in the circumstances of this case.

■ A further issue in this appeal relates to the superior court's order that three of the remaining four pieces of property involved in Valdez Development's original bid on 40 lots should be conveyed to it.[15] The company's bid had been accepted by the city subject to the determination that no conflict existed. Record keeping in Valdez was at the time disorganized and it was difficult to ascertain whether any particular lot was in fact available. The city determined that the four parcels in question had been previously sold, though not yet recorded, and therefore did not execute contracts for these lots with Valdez Development.

The superior court found that the language in the bid acceptance was ambiguous and required interpretation. It interpreted the language to mean that if the city of Valdez within a reasonable time became ready and able to convey those properties to Valdez Development as the bidding party, then the city would convey the land to Valdez Development. Since the properties had been returned to the city, the court found that a conflict no longer existed and ordered conveyance of the three lots to Valdez Development. We find this interpretation to be erroneous.

In our view, a conditional acceptance or counter-offer was extended by the city of Valdez to the bid submitted by Valdez Development. When a conflict to contract formation was discovered by the city, the city's offer to enter into a contract was revoked. In circumstances where there is no longer an open offer, a change in the situation of one of the parties, such as the re-

11. Ward v. Union Bond & Trust Co., 243 F. 2d 476 (9th Cir. 1957).

12. 501 P.2d 769, 771 (Alaska 1972).

13. See Knickerbocker Life Ins. Co. v. Norton, 96 U.S. 234, 24 L.Ed. 689 (1878).

14. The trial court ordered in part:
    That, with regard to the 33 lots specified in the counterclaim, Valdez Development Company shall have until six months after the date that the Trans-Alaska pipeline is finally approved by unappealed decision of the court of appeals, decision of the United States Supreme Court, or presidential proclamation, to commence on all lots not later than six months from October 31, 1973.

15. One of the lots was still owned by another party and was therefore not part of the order.

turn of the property to the city, does not then result in a contract being formed.[16] Thus, the title to these three lots should be revested in the city.[17]

■ Valdez Development asserts in its cross-appeal that the counterclaim filed by the city in June of 1969 to regain title to the 36 lots caused a cloud on its title and prevented it from obtaining the necessary financing to commence housing construction. Valdez Development asserts that the counterclaim should be characterized as an act of malicious prosecution. The company estimated that were it not for the counterclaim, 15 houses could have been built at a profit of $10,000 per house, and therefore prayed for damages of $255,000. The superior court held that while the counterclaim "could have been retaliatory, no damages were shown."

Since we have concluded that the superior court's finding that no damages were shown should be affirmed, we need not reach the question of whether a prima facie case of malicious prosecution was established. The record shows that prior to the filing of the counterclaim, construction had not yet begun, that the construction season in Valdez is about five months long, and that almost two of these had passed prior to the filing of the city's counterclaim. Valdez Development was still in the process of assembling plans and had engaged in tentative negotiations with only one possible purchaser. After the counterclaim was filed, development plans were obtained and approved by the Alaska State Housing Authority, the purchase price was

paid, and a letter of financing was obtained. The only evidence presented at trial on the issue of damages was the testimony of one of the partners of Valdez Development that $10,000 was approximately the profit expected to be made on each house. We hold that the record supports the superior court's conclusion that the company's damages were not sufficiently established. We are not left with a definite and firm conviction that a mistake has been committed, and therefore affirm the superior court's finding that no damages were shown. State v. Abbott, 498 P.2d 712 (Alaska 1972).

■ The superior court also found that each party prevailed on a main issue and therefore awarded neither party attorney's fees. Valdez Development prevailed on the property forfeiture issue, and the city of Valdez won on the cross-appeal for damages. Both awards are of approximately equal value.[18] The amount to be awarded as attorney's fees is committed to the sound discretion of the trial court and review is limited "in matters of this kind to the question of whether the court exceeded the bounds of the broad discretion vested in it."[19] The purpose of Civil Rule 82 in providing for the allowance of attorney's fees is to partially compensate a prevailing party for the costs to which he has been put in the litigation in which he was involved. In the case at bar, where neither party can be characterized as the prevailing party, we have concluded that the superior court did not abuse its discretion in refusing to award either party attorney's fees.[20]

16. See Lexington Housing Authority v. Continental Cas. Co., 210 F.Supp. 732 (W.D.Tenn. 1962) ; 1 S. Williston, Contracts § 77 (3d ed. 1957).

17. In conjunction with the return of title, if it is found upon remand that the city retained the purchase price and taxes paid for these lots, this money should be refunded to Valdez Development with accrued interest.

18. The 36 lots retained by Valdez Development are claimed by the city to be worth approximately $5,000 a piece, and the company's expenses incurred related to construction on

these properties equals about $50,000. Valdez Development therefore retained property worth about $230,000 in its successful defense against foreclosure. The city of Valdez retained $255,-000 in its successful defense against the malicious prosecution charge.

19. Preferred Gen. Agency of Alaska, Inc. v. Raffetto, 391 P.2d 951, 954 (Alaska 1964) ; Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970).

20. Remand for correction of trial court error in awarding the additional three lots shall have no effect on the attorney's fees issue.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.[21]

ERWIN, J., not participating.

CONNOR, Justice (dissenting).

The majority opinion properly recognizes that the injunction issued by the federal court cannot excuse performance by appellee, for that injunction did not directly prohibit construction of housing in Valdez, Alaska, or anywhere else. The majority opinion concludes, however, that because the federal injunction did prevent construction of the trans-Alaska pipeline, and because this dried up any available sources of financing, appellee's delay in performance should be excused. With this conclusion I must respectfully disagree.

At the time the contract was formed no permit for the construction of the pipeline had been issued. It was then uncertain as to when the permit would be forthcoming. The vicissitudes of national governmental action on the pipeline project were part of the background against which the parties made their bargain. But nothing in the contract documents makes reference to the granting or withholding of the pipeline permit. Had the parties desired to hold the project in suspense in the event that an injunction against the issuance of the pipeline permit were granted by a federal court, it would have been a simple matter to include such a contingency in the written agreement. But this was not done.

I do not see this occurrence as coming with the "unforeseeable causes" of enforced delay mentioned in Section 707 of the contract. Rather, this case strikes me as being analogous to Glidden Co. v. Hellenic Lines, Ltd., 275 F.2d 253, 257 (2d Cir. 1960). There a charter party for transporting ores between India and the United States was ambiguous about the precise route intended. When the contract was formed the parties were aware that the Suez Canal might be closed because of the Israeli-Egyptian war. As a result of the closure of the Suez Canal it became necessary for the operator of the chartered vessels to transport the ore via the Panama Canal or around the Cape of Good Hope. The court held that this occurrence, the possibility of which had been equally apparent to both parties to the contract at the time they entered into it, did not excuse performance of the primary contractual obligation to transport the ore.

In my opinion this case should be governed by the principle that facts occurring after a bargain is made, which render performance more difficult or expensive than the parties anticipated, do not discharge a duty to perform. Restatement, Contracts, Section 467. If we were to so hold, we would merely place the parties in the status quo ante, and the development of the lots which were the subject of this project could begin anew, on a fresh basis.

I would, therefore, reverse and remand for the entry of a judgment in favor of the City of Valdez.

21. The absolute deadline of "not later than six months from October 31, 1973" for commencement of construction set by the lower court as part of its disposition of this case has expired while this appeal was under consideration. Consequently, it will be necessary for the superior court upon remand to impose a second deadline, guided by considerations of reasonableness, for the commencement of construction by Valdez Development.