David L. CURRY, Appellant,

v.

George TUCKER and Carol Tucker; and First National Bank of Anchorage, Appellees.

No. 4249.

Supreme Court of Alaska.

Sept. 5, 1980.

Douglas F. Strandberg, Sourant & Strandberg, Anchorage, for appellant.

Donna C. Willard, Richmond, Willoughby & Willard, Anchorage, for George and Carol Tucker, appellees.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER *, BURKE and MATTHEWS, JJ.

BURKE, Justice.

In this action for breach of contract, the primary question to be determined is whether the vendee's conduct in breaching two real estate contracts justified the trial court's application of the extreme remedy of forfeiture. We conclude that under the circumstances of this case the declaration of forfeiture was appropriate.

In late 1967, David Curry was in severe financial trouble. He had recently been forced to close his business and had lost his homestead through foreclosure. He sought assistance from his friend and former employer George Tucker who, along with his wife, Carol, was then the developer of Crestbrook subdivision. Mr. Tucker agreed to allow Curry to store equipment on lot 9 of the subdivision and to live rent free in a dilapidated fourplex on the adjacent lot 10. The money and materials necessary to make the building habitable were advanced by Tucker.

Sometime in 1968, Curry decided he wanted to purchase and develop the property. He approached Tucker with this plan and, after extensive discussion, they entered into an oral contract for the sale of lots 9 and 10. Curry was to pay $4,875 for lot 9 and $14,500 for lot 10 in monthly installments of $100 and $250 respectively, with each contract accruing interest at 8%. To further assist Curry in getting back on his feet, Tucker agreed to help Curry obtain the materials necessary for him to finish the fourplex. Between 1968 and November 1970, Tucker advanced Curry $6,688.08 to cover property taxes, utilities, insurance, materials, labor and Curry's bank payments on a prior unrelated loan. During this period Curry was employed, yet made no payments under the oral contracts for 1968 or 1969.

On November 13, 1970, at Curry's request, the oral contracts were reduced to writing. As of this date, Curry had paid Tucker $4,000. Of this amount, $2,200 was used to repay Tucker for bank payments made on Curry's behalf in satisfaction of the prior loan. The remaining $1,800 was treated as a down payment on the lots, $1,000 on lot 10 and $800 on lot 9. It was further agreed that the purchase price of lot 10 would be increased by the $4,488.08 still owed for the advances between 1968–1970. In all other respects the written contracts reflected the terms of the prior oral contract. Thus, as of November 1970, Curry owed Tucker a total of $22,063.08 under the written contracts. The contracts were signed and escrow instructions were drawn up but, at Curry's request, the contracts were not recorded and the escrow instructions were not utilized.

By April 1971, the focus of Curry's plans had changed. Rather than immediately completing the fourplex, he now wanted to build an apartment and a large garage from which he could operate a business. Curry requested that Tucker provide the necessary financing. Tucker agreed to provide additional advances subject to a 10% overhead charge to cover his office expenses. The purchase price of lot 10 was to be further modified to include all such advances or charges. Pursuant to his promise, Tucker provided additional advances of $11,111.08 during 1971. Curry, however, made no payments throughout 1971. Thus, as of the end of 1971, Curry's obligations under the contracts, including interest and overhead, totalled $36,197.39.

In 1972, Curry expressed a renewed interest in completing the fourplex. He once

*This case was submitted to the court for decision prior to Justice Boochever's resignation.

again approached Tucker for assistance, proposing that if Tucker could fund the project himself, or obtain a loan from a bank, Curry would provide all of the necessary labor and make the bank payments. Tucker ultimately agreed to obtain the maximum possible loan of $65,000 on the condition that the proceeds of the loan be used first to pay Tucker the amount then due under the contracts. The balance of the loan was then to be distributed to Curry by Tucker as the work progressed and materials were needed. Curry was to repay the loan by making monthly payments of $622 to Tucker who would remit them to the bank. Curry did not, however, make any such payments. As a result, Tucker was forced to meet the obligations himself. Furthermore, during the remainder of 1972, Tucker provided additional advances of $17,248.57 to cover not only materials but also labor, cash loans, insurance, taxes and utilities. The fourplex remained uncompleted, however, primarily because Curry had diverted substantial labor and material into a 1,715 square foot one bedroom apartment above the garage for his personal use rather than into the fourplex as had been agreed. As a result of these additional advances, the total owed under the contracts at the end of 1972, including interest and overhead, was $60,018.68.

In mid–December of 1972 through September 1973, Curry was employed by Tucker. It was agreed that Curry would receive only a portion of his earnings with the balance being credited against his contractual obligations. Pursuant to this agreement, $7,007.47 in earnings was credited against the interest which had accrued on Curry's debt. At trial it was established that Curry was entitled to an additional credit of $73.00. Despite this arrangement it was necessary for Tucker to make additional expenditures of $7,253.60 on the lots during 1973. Thus, the total owed on the contracts at the end of 1973, including interest and overhead, was $65,343.89.

By early 1973, the bank payments, taxes and insurance had become a serious burden to Tucker who was having cash flow problems. Tucker discussed various solutions with Curry including selling the property, taking a partner or seeking credit elsewhere. Curry rejected all of these suggestions. As Tucker's cash problems worsened in the summer of 1973, the prospect of a Chapter XI proceeding became likely. Tucker once again discussed the situation with Curry and offered to deed the property over to him, or anyone he chose, if he assumed the bank payments as he had agreed. Curry declined this offer, first because he still did not want the property in his name and then because he did not believe he owed as much as was due on the loan.

On October 31, 1973, Tucker initiated a proceeding for an arrangement under Chapter XI. Shortly thereafter Curry approached Tucker seeking additional funds. When Tucker informed Curry that he was unable to advance any more money or materials Curry became agitated. An argument ensued with Curry refusing to accept the amount of his obligations or to look at the books. This was essentially the final discussion between the parties prior to litigation.

Curry has made no attempt since 1973 to make any payments on his obligations. Tucker has thus been burdened with all of the necessary expenditures. The total amount due under the contracts as of the date of trial was $99,361.16, consisting of $71,468.48 in direct costs including the original sales price, $4,940.74 in overhead charges and $22,951.94 in unpaid interest charges. The total paid by Curry under the contracts was $8,880.47. Curry has never offered to tender the amount due under the contracts.

In July 1975, Tucker moved to regain possession of the lots by serving Curry with a Notice to Quit and Vacate pursuant to clause seven of the contracts. When Curry refused to vacate, the Tuckers filed this action seeking to recover possession of the lots. Curry denied the allegations in the complaint, maintaining that it was Tucker who had breached the contracts by failing to provide Curry with money and material

sufficient to complete the buildings. Curry counterclaimed for damages as a result of this alleged breach. After a lengthy trial in which the parties presented two dramatically different versions of the facts, the trial court held entirely in favor of the Tuckers, granting them legal title to lots 9 and 10. This appeal followed.

We turn first to the trial court's findings of fact. Curry objects to a number of these findings on the grounds that they were not supported by the evidence.[1] Under the clearly erroneous standard mandated by Civil Rule 52(a),[2] this court will overturn the findings of a trial court only when we are convinced in a firm and definite way that a mistake has been committed. *Hausam v. Wodrich*, 574 P.2d 805, 810 (Alaska 1978). A careful review of the record has disclosed substantial evidence in support of the trial court's findings. As such, we are unable to conclude that the challenged findings were clearly erroneous.[3]

We now turn to the question of forfeiture. Curry contends that the Notice to Quit and Vacate was ineffective because it did not specify in what way he had breached the contracts or the time period in which he could cure the breach.[4] We find this argument unpersuasive. Despite numerous reminders of his obligations, Curry had made virtually no payments under the contracts since their formation. Under these circumstances, Curry can hardly contend he was unaware of how he had breached the contracts. *See Alaska Placer Co. v. Lee*, 455 P.2d 218, 227 (Alaska 1969). Furthermore, while courts have generally required that such notices specify the time in which default may be cured,[5] the omission of this information does not automatically make the notice ineffective. Where, as here, the forfeiture provision itself includes a statement of the time within which default may be cured,[6] the requirement that

1. In his brief Curry notes that the findings of fact entered by the trial court constitute a verbatim adoption of the proposals submitted by Tucker. We have expressed strong disapproval of this practice in the past. *Fairbanks Builders, Inc. v. Morton DeLima, Inc.*, 483 P.2d 194, 197 (Alaska 1971); *Rogge v. Weaver*, 368 P.2d 810, 814–15 n.7 (Alaska 1962). That the trial court's findings are the product of this disfavored practice does not, however, make them subject to summary dismissal. Rather, the clearly erroneous standard must still be applied. *George W. Bennett Bryson & Co. v. Norton Lilly & Co.*, 502 F.2d 1045, 1049 n.17 (5th Cir. 1974).

2. Rule 52(a), Alaska R.Civ.P., provides in pertinent part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

3. Determinations of credibility are for the trier of fact and will generally be accepted on review. This is so because, unlike the reviewing court, the trier of fact saw the witnesses testify, heard the inflection of their voices and observed their relative candor in answering questions. *B.B. & S. Constr. Co. v. Stone*, 535 P.2d 271, 274 n.4 (Alaska 1975).

4. The Notice to Quit and Vacate provided, in pertinent part: "You have materially breached Sections 4 and 7 of the Real Estate Contracts executed between yourself as buyer and George H. Tucker and Carol J. Tucker as sellers by your failure to make the payments as set forth in Section 1 of the aforesaid contracts."

5. *Lopez v. Bell*, 207 Cal.App.2d 394, 24 Cal. Rptr. 626, 629 (1962); 3 A. Corbin, Corbin on Contracts § 764 (1960); 77 Am.Jur.2d *Vendor and Purchaser* § 588 (1975).

6. The forfeiture provision in each of the contracts in question provided:

7. *FORFEITURE*: Time is of the essence in this agreement and in the event that Buyers shall fail or refuse to make the payments hereinabove provided, or shall fail to keep and perform any of the other terms and conditions of this agreement, including the payment of principal and interest as herein above provided, it shall be optional of Sellers to declare a forfeiture of this agreement and Buyers shall thereby forfeit to Sellers as liquidated damages all payments theretofore made and Sellers shall be relieved of any obligation, either at law or in equity, to convey said premises to the Buyers, provided that Sellers shall in exercising the option for [sic] forfeit said agreement give the Buyers thirty (30) days' [sic] written notice specifying the particulars in which Buyers are in default and Buyers shall have five (5) days in which to correct or remove any default thus complained of and said written notice shall be certified, postage prepaid, and directed to the Buyers at their address, or at such other place or address as Buyers may leave with the escrow holder.

the vendee be made aware of this alternative to forfeiture is satisfied. We therefore conclude that, under the facts of this case, the Notice to Quit and Vacate was not too general to be effective.[7]

■ The issue thus becomes whether the trial court's application of the extreme remedy of forfeiture was justified. It is well settled in this jurisdiction that equity abhors a forfeiture and that when the principles of equity and justice so require, a court may, in its sound discretion, refuse to enforce a forfeiture provision in a land sale contract. *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972); *McCormick v. Grove*, 495 P.2d 1268, 1269 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964). The trial court's decision in such circumstances will not be set aside unless it is against the clear weight of the evidence. *Moran v. Holman*, 501 P.2d at 771; *Jameson v. Wurtz*, 396 P.2d at 74.

■ As we noted in *Moran*, in determining when to evoke forfeiture, a court's primary consideration is to save the respective parties harmless from loss or damage and, if just and equitable, to permit them each to have the benefit of their bargains. *Moran v. Holman*, 501 P.2d at 771, *quoting Ward v. Union Bond & Trust Co.*, 243 F.2d 476, 480 (9th Cir. 1957). Thus, we have often stated that where adequate compensation can be made, equity will discharge the forfeiture upon such compensation being made.[8] This is not to say, however,

that equity will discharge a forfeiture in *all* cases where adequate compensation can be made. Rather, we recognize that in some extreme cases the purchaser's history of performance is so inauspicious that equity not only allows a forfeiture, it demands a forfeiture. *See Alaska Placer Co. v. Lee*, 455 P.2d 218 (Alaska 1969).[9]

■ In the instant case, Curry has made no good faith efforts to fulfill his obligations under the contracts. Despite numerous reminders of his duty to make monthly payments, Curry made no such payments in 1968, 1969, 1970, 1971, 1972, 1974, 1975 and only minimal payments in the form of retained wages in 1973. During this period, Curry lived rent free on the property, first in the fourplex and then in a 1715 square foot one bedroom apartment built primarily with money, material and labor supplied by Tucker in order to complete the fourplex. Furthermore, from the time he was first served with the notice of forfeiture until the date of trial, Curry made absolutely no effort to tender the purchase price or in any other way fulfill his contractual obligations.[10] Tucker, on the other hand, has seemingly done everything humanly possible to assist Curry, even to the point of endangering his own financial status. Indeed, it was only after Tucker had been pushed to the brink of bankruptcy that he refused to continue to meet Curry's obligations. Even then Tucker suggested various alternatives which would have allowed Cur-

---

7. Curry also argues that Tucker waived his rights under the forfeiture provision. We do not, however, find it necessary to decide this question since any waiver which may have occurred would have been cured by the subsequent Notice to Quit and Vacate. *Martin v. Maldonado*, 572 P.2d 763, 769 (Alaska 1977).

8. *See, e. g., City of Valdez v. Valdez Dev. Co.*, 523 P.2d 177, 183 (Alaska 1974); *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964). *See also Knickerbocker Life Ins. Co. v. Norton*, 96 U.S. 234, 24 L.Ed. 689 (1878).

9. In *Alaska Placer* we upheld the forfeiture of a lessee's interest in a mining lease under somewhat similar extreme circumstances stating:

Considering the very small percentage of the total purchase price paid by Lee, the fact that in prior years Lee had failed to put the mining claims in production, and the fact that [the vendor] was counting on Lee to produce in 1965, which he did not do, we do not consider it inequitable to enforce the forfeiture clause of the contract according to its terms.

455 P.2d at 227.

10. Thus, the instant case can be distinguished from *Moran v. Holman*, 501 P.2d 769 (Alaska 1972), where the vendee demonstrated his good faith by making repeated and continuous tenders of the full purchase price after being served with a notice of forfeiture.

ry to keep all or a part of the property, all of which Curry summarily rejected. Under the circumstances, it does not seem inequitable to allow the contract to be enforced according to its terms.

Moreover, we are not convinced that Curry will suffer any undue hardship under the trial court's decision. Although Curry claims that he will lose approximately $87,000 as the result of the forfeiture, this amount consists almost entirely of appreciation.[11] We see no reason why Curry should be allowed to reap the benefits of this appreciation which was primarily attributable to Tucker's money and patience.[12] A review of the record discloses that Curry's actual loss would be limited to approximately $10,380.47 in out–of–pocket expenses.[13] In light of the benefits Curry received under the contracts, such as the rent free use of the property for the last ten years which was valued at over $71,000,[14] we do not feel that the declaration of forfeiture was unjust.

Finally, to refuse to enforce a forfeiture provision under these extreme circumstances would as a matter of policy be unsound. It would encourage unscrupulous purchasers to delay performance until the very eve of trial, all the while secure in their knowledge that they may recover the property at any time by tendering "adequate compensation." Vendors, on the other hand, would have no means of ensuring that the agreed upon payments would be made in a timely manner. Such an imbalance in the parties relative abilities to guarantee performance would be fundamentally unfair. We, therefore, hold that under the circumstances of this case the trial court did not abuse its discretion in declaring a forfeiture of Curry's rights under the contracts.

Curry further contends that the trial court's award of $12,865.50 for expert witness costs was unreasonable. We will affirm the trial court's award of costs under Civil Rule 79 unless the award is so manifestly unreasonable as to constitute a clear abuse of discretion. *Kaps Transport, Inc. v. Henry*, 572 P.2d 72, 77 (Alaska 1977); *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974). After reviewing the record as a

11. The conservative fair market value of the property was $24,000 as of December 1970, $117,000 as of December 1973, and $187,000 as of the date of trial.

12. In determining whether or not forfeiture is appropriate, our dissenting colleague would apparently include any increase in the value of the land as part of a breaching vendee's equity under the contract. We cannot accept this position. Rather, we believe that the allocation of appreciation should be determined on a case–by–case basis, considering all of the circumstances surrounding the increase in the land's value. Under this rule, appreciation will generally be included in the vendee's equity as part of his bargained–for benefit under the contract. Certainly this is true where the appreciation is due in part to valuable improvements made on the land by the vendee. *See Moran v. Kenai Towing and Salvage, Inc.*, 523 P.2d 1237, 1241 (Alaska 1974); *Williams v. DeLay*, 395 P.2d 839, 846 (Alaska 1964). However, in rare instances such as the case at bar, where the appreciation is primarily attributable to the vendor's time, money and patience, expended in a continuing effort to help the vendee cure his repeated breaches, it is only just that the appreciation *not* be considered part of the breaching vendee's equity.

13. This amount consists of $8,880.47 actually paid to Tucker and $1,500 spent on materials. Curry also claims a substantial amount of sweat equity in the property as the result of labor which he allegedly performed on the four-plex and garage. While there is some evidence in the record supporting his claim of having worked on the buildings, there is no indication of how much work he performed or what the value of his efforts was. In any case, we believe that any sweat equity which Curry may have established would be insignificant when weighed against the benefits he received and the enormity of his breach.

14. In count III of his complaint Tucker sought the reasonable rental value of the property for the duration of Curry's occupancy. Throughout this litigation Curry has maintained that this claim to rent is without legal basis. On appeal he contends that the trial court committed reversible error by failing to dismiss this claim and by entering findings upon it. In light of the fact that the trial court did not award Tucker any damages on this claim, we feel it is unnecessary to reach this question.

whole, we are not convinced that this award was an abuse of discretion.[15]

AFFIRMED.

MATTHEWS, J., dissents.

MATTHEWS, Justice, dissenting.

Although I accept the underlying facts as found by the trial court, I reach a different conclusion. A new agreement was made in 1972 when $65,000.00 was borrowed from the bank. By virtue of that loan Tucker was completely paid on the earlier contracts and in addition, held some $24,529.29 of Curry's money. The account between the parties continued to be in Curry's favor due to this surplus and Curry's uncompensated employment by Tucker for which he was to receive credit on the sale price until the first part of 1974.

Curry was in default in 1974 and until the notice of default was served in July of 1975. However, during that 18 month period there was, understandably, a dispute as to the amount due. Further, in October of 1973, Tucker had filed a petition under Chapter 11 of the Bankruptcy Act[1] listing the property as his own, subject only to an option in Curry. Moreover, Tucker had in 1973, acting as the owner of the property, given a deed of trust covering the property to a bank as security for a $150,000.00 loan.

Curry's equity in the property is said to be some $87,000.00.[2] Given the magnitude of this amount and the clouded circumstances which existed during the 18 months in which Curry was in default, I believe a strict forfeiture is inappropriate. Instead, in accordance with our prior decisions[3] the court should have given Curry a reasonable grace period in which to pay the amount owing Tucker. If such payment was not made the property would thereafter be reconveyed to Tucker.

---

15. Curry also challenged the trial court's award of attorney's fees. This challenge was, however, expressly conditioned upon our reversing the trial court. Inasmuch as we have concluded that reversal is not required, it is unnecessary to review the attorney's fees award.

1. Tucker's testimony indicated that his 1973 financial crisis was the result of other business dealings. Further, Tucker's own accounting records show that in October of 1973 when he filed for an arrangement and at the end of that year, the account which reflected his transactions with Curry had a credit balance. Exhibit 16. Therefore, the majority's suggestion that Tucker supported Curry to the point of "endangering his own financial status" is not supported by the evidence.

2. The majority's suggestion that a secured lender, rather than the owner of the property, is entitled to the benefit of rising real estate values is not backed up by any authority. Our cases establish that the lender is entitled to be repaid, plus interest and costs, and the owner is entitled to his property. See Hagberg v. Alaska Nat. Bank, 585 P.2d 559, 561–62 (Alaska 1978); See generally McHugh v. Church, 583 P.2d 210, 216 (Alaska 1978); Moran v. Kenai Towing and Salvage, Inc., 523 P.2d 1237, 1241 (Alaska 1974); Harris v. Alaska Title Guaranty Co., 510 P.2d 501, 505 (Alaska 1973); Moran v. Holman, 501 P.2d 769, 771 (Alaska 1972); Semlek v. National Bank of Alaska, 458 P.2d 1003, 1006 (Alaska 1969); Land Dev., Inc. v. Padgett, 369 P.2d 888, 889 (Alaska 1962).

3. See Hagberg v. Alaska Nat. Bank, 585 P.2d at 561–62; Moran v. Holman, 501 P.2d at 770; Jameson v. Wurtz, 396 P.2d 68, 74 (Alaska 1964); Land Dev., Inc. v. Padgett, 369 P.2d at 889–90. See generally City of Valdez v. Valdez Dev. Co., 523 P.2d 177, 183 (Alaska 1974).