ALASKA PLACER COMPANY, Appellant,

v.

Richard E. LEE and Phyllis Lee, Appellees.

No. 847.

Supreme Court of Alaska.

June 4, 1969.

Charles E. Cole, Fairbanks, for appellant.

Joseph Rudd, of Ely, Guess, Rudd & Havelock, Anchorage, for appellees.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, Justices.

DIMOND, Justice.

Appellant owned 15 tin mining claims on Cape Creek, near Nome, Alaska. In March 1965 appellees entered into a written agreement with appellant to purchase the claims for $400,000. The purchase price was payable $2,500 in cash upon execution of the agreement, $5,000 from smelter receipts from the 1965 production, and the balance in annual payments equal to 15 percent of the annual net mineral production of tin concentrates.

Appellees were to work the mines to their full capacity. It was provided that if appellees failed to perform their part of the agreement, appellant had the option to forfeit appellees' interest in the property. Upon notice of forfeiture being given, appellees would have 30 days to remedy the failure to perform. If appellees' failure to perform was not corrected within the 30-day period, they agreed to quit the premises and surrender possession to appellant.

On October 5, 1965 appellant sent a telegram to appellees giving notice of forfeiture of their interest in the mining claims, "for non-performance of minimum requirements among other reasons." Appellees failed to vacate the claims, and in March 1966 appellant brought this action to enjoin appellees from mining the claims. After a trial the court entered judgment for appellees and appellant then brought this appeal.

Paragraph (3) of the agreement provided as follows:

Lee covenants and agrees at his own expense, to be on the mining properties with the proper and sufficient mining equipment, and with a sufficient working crew to actively work the mines in a good workmanlike manner to its full capacity of production on the first day of each year when weather conditions are such that a reasonable and prudent operator interested in securing maximum production from his own property would be on the same or similar property in the Nome area and continue to work said mining operation in such fashion continuously each day (seven days per week) thereafter so long as weather conditions are such that a reasonable and prudent operator would continue to work in. Lee agrees to work in said manner and for said time each year of the term hereof until the purchase price has been paid in full. For the purposes of this paragraph, "sufficient working crew and equipment" shall be defined as requiring the following minimum workers:

Equipment and skilled workmen required to work said property in a minerlike manner so as to deliver at least 1200 tons of ore bearing material to the washing plant on said property each production day.

The obligations of Lee under this paragraph are subject to Acts of God, strikes or other matters over which he has no control.

During the 1965 mining season, between July and October, only 3,500 tons of material were delivered to the washing plant. Appellant claims that this amounted to a default on the part of appellees, since the language of paragraph (3) of the agreement required the delivery to the washing plant of 1,200 tons of ore bearing material each production day. Appellees contend that this is not what the agreement calls for—that the 1,200 ton requirement merely defined a standard of capability and was not a requirement of the contract. The trial judge agreed with appellees. In his oral opinion he said:

I find that it was not the intention of the parties for 1200 tons of ore to be washed each day. I find that it was not the intention of the parties that 1200 tons of ore be delivered to the washing plant each day. Some days the parties may be stripping and working in other phases of mining about the claims. The real intentions of the parties was as stated by Mrs. Richard E. Lee and Richard O. Lee that there would be men and equipment in the area sufficient to have delivered

1200 tons of ore bearing material to the washing plant each day.

In two prior decisions we applied the rule that where the terms of a contract are ambiguous or uncertain—

[I]ntent may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated.[1]

The initial question is whether that rule is applicable in this case.

As Professor Corbin points out:

[S]eldom in a litigated case do the words of a contract convey one identical meaning to the two contracting parties or to third persons. Therefore, it is invariably necessary, before a court can give any meaning to the words of a contract and can select one meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that extrinsic evidence shall be heard to make the court aware of the "surrounding circumstances," including the persons, objects, and events to which the words can be applied and which caused the words to be used.[2]

We have such a situation here. The fact that the contracting parties are in disagreement as to the meaning of paragraph (3) of the contract indicates that the language there does not convey one identical meaning to the two parties. Nor are we able to say that the meaning is so clear that extrinsic evidence bearing on the intention of the parties should not be considered. The trial judge permitted the introduction of evidence of all surrounding circumstances relevant to the issue of what the parties intended by paragraph (3) of the contract, without any exceptions or limitations. We believe this was proper.[3]

A history of the dealings between the parties leading up to the formation of the 1965 contract is pertinent. On April 6, 1960 a lease with option to buy was executed between H. G. Gabrielson and Ralph Lomen, lessors, and Richard E. Lee, lessee. This lease was for the same mining claims as those involved in the present litigation. Under the lease Lee was obligated to mine the property for tin and to continue mining operations every year. However, as of 1964 Lee had only done some stripping of the overburden on the mines. He had not taken any ore out.

Meanwhile in 1962 Gabrielson died and his interest in the claims passed to his widow, Pauline Gabrielson. In 1963 Mrs. Gabrielson gave Kirk Dunbar, her son-in-law, a special power of attorney with respect to her interest in the claims. Subsequently, Alaska Placer Company was formed and Mrs. Gabrielson and Ralph Lomen transferred their interest in the claims in exchange for capital stock.

In January 1964 a meeting was held in Seattle, Washington, to discuss the situation of the tin mines. Richard E. Lee, Ralph Lomen and Kirk Dunbar were present. Lomen and Dunbar told Lee they were unhappy with the lack of production from the mines. Lee offered a number of reasons for his inability to produce but added that he had done two years of stripping in advance and was ready to go into production. Lee's explanations evidently satisfied Lomen and Dunbar, because on January 31 Dunbar wrote Lee expressing the hope that Lee's plans for the 1964 season would be effective.

Various difficulties prevented Lee from getting to Cape Creek until quite late in the summer. By October 16, 1964 Lee had not begun actual production of the ore bearing material, although he had stripped some overburden. Evidently, by this time it was too late in the season to do any mining.

In a letter dated February 19, 1965 Dunbar informed Lee that he was in default under the lease. Dunbar stated that he,

---

1. Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968) ; Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965).

2. 3A Corbin, Contracts § 536, at 28 (1960).

3. *See* 3A Corbin, Contracts § 536, at 36–38 (1960).

Lee and Lomen should meet in Seattle in March to discuss the situation. The meeting was held on March 25, 1965. Present were Richard E. Lee, his wife Phyllis Lee, his father Richard O. Lee, Ralph Lomen and Kirk Dunbar. Dunbar stated that the owners of the tin claims were upset over the lack of production, and that the purpose of the meeting was to determine whether Lee should be permitted to mine the claims in 1965. Dunbar told Lee that they would have to arrive at some sort of a performance contract in order to proceed further. It was then that the written agreement for the sale of the mining claims was entered into by appellant and appellees.

As to what was intended by paragraph (3) of the agreement, Dunbar testified that in the discussions prior to the formation of the agreement he had suggested that as part of the agreement appellees be required to deliver through the washing plant 60 tons of ore bearing gravel an hour, that Lee had objected to such a requirement because of the presence of large boulders that could not go through the washing plant, that Dunbar had then agreed that delivery to the washing plant of 60 tons an hour would suffice, and that Dunbar had arrived at the figure of 1,200 tons a day by figuring that appellees would deliver 60 tons an hour during a day of two shifts of 10 hours each, for a 20-hour working day.

Dunbar stated that the purpose of the contract was for the production of tin, that the contract required production by appellees, and that the language of paragraph (3) meant that appellees were to deliver to the washing plant each day 1,200 tons of ore bearing material in order that tin could be produced from the mining operation. Dunbar anticipated that appellees would fulfill the terms of the contract in producing tin because, as Dunbar stated, Lee had told him that he had spent all of 1964 repairing equipment, that it was all ready to go, that Lee would get on the claims on the first day of the 1965 season and start mining, and that he had a two-year stockpile of ore bearing gravel to mine.

In his testimony Lee denied having done any stockpiling of gravel. But his testimony on this score was with respect to only a specific, limited area of the mining property. He was asked whether, at the March 1965 meeting, he had made any statements as to number of tons of ore bearing material that he would carry to the washing plant in 1965. Lee replied: "I don't remember having said anything like that." He said that at that meeting he did not think there were "any figures or numbers" discussed-apparently referring to Dunbar's testimony that the parties had discussed the number of tons of material that were to be delivered to the washing plant each day.

Lee was not consistent in stating that "figures or numbers" were not discussed. Later in his testimony he said that he "objected to the tonnage requirements that was put in there as specifying a definite amount of material that should be processed every day." Obviously, Lee and Dunbar must have discussed tonnage figures if Lee objected to the language in paragraph (3) of the contract as to delivery of 1,200 tons of material to the washing plant each day.

Also of some significance in Lee's testimony is the fact that his objection was to agreeing to process *"through* the washing plant" each day 1,200 tons of material. [Emphasis added.] But this was not a requirement of the contract. The language of paragraph (3) refers only to delivery to the washing plant of 1,200 tons of material each day, and not to the processing through the plant of this amount of material. This distinction was explained by Dunbar when he testified, as we have already noted, that because of large boulders Lee would not agree to the actual washing or processing of that amount of material every day, but could agree to the delivery of it to the washing plant.

The testimony of Lee to some extent is contradictory of Dunbar's testimony that it was the intent of the parties for appellees to actually deliver to the washing plant each day 1,200 tons of ore bearing material.

But there was other testimony of Lee which was consistent with the intent of that paragraph as Dunbar saw it. Lee testified that he had engaged in stripping operations in 1960, 1962 and 1964. This testimony would tend to show that if overburden had been stripped off during a three-year period, the remaining ore bearing material would be available for actual mining and that time would not be required for stripping in 1965. Also, Lee was asked whether he planned production in 1965 and he said: "We did. Very definitely."

Lee was eventually asked what Dunbar had said to him about that portion of the language of paragraph (3) of the contract which stated:

For the purposes of this paragraph, "sufficient working crew and equipment" shall be defined as requiring the following minimum workers:

Equipment and skilled workmen required to work said property in a minerlike manner so as to deliver at least 1200 tons of ore bearing material to the washing plant on said property each production day.

Lee's answer was:

Well he said that that wasn't the intent that the, of the wording. That he was more particularly interested in securing a level of production and a level of equipment consistent with that level of production. That it did not confine it to a strict adherence of of [sic] 1200 tons a day during the production year.

This does not controvert Dunbar's position as to what was meant by the foregoing language. What Lee is saying is that strict adherence to the production of 1,200 tons of material a day was not intended, but that Dunbar did intend that there be a "level of production". The only measure of such "level of production" could be the provision for producing material at the rate of 1,200 tons a day. Lee's testimony is not consistent, and it is hardly persuasive as to his interpretation of the above quoted language of the contract.

Finally Lee was asked:

Then what was your understanding based on the conversations you had as to the intention of the clause at the time you signed the contract?

He answered:

Well, my understanding is pretty well as I interpret this wording that we shall have the equipment and the men and required, that it's required to work the property in a minerlike manner on a level that would provide, under normal conditions, a production of 1200 tons a day.

The only sensible way that this testimony could be construed is that Lee looked upon the contract language in question as appellant looked upon it, i. e., as expressing the contracting parties' intent that appellees meet the standard of production equal to at least 1,200 tons of ore bearing material being delivered to the washing plant each day.

■ That is how we construe the language of the contract. The first part of paragraph (3) required Lee to be on the mining property with the proper and sufficient mining equipment and with a sufficient working crew "to actively work the mines in a good workmanlike manner to its full capacity of production." The term "sufficient working crew and equipment" was expressly defined as we have noted above. The history of Lee's activities on these mining claims, from 1960 until the agreement was made in 1965, shows that the owners of the claims were dissatisfied with the fact that over the years Lee had not produced tin, which was the ultimate reason for carrying on mining operations. In 1965 the owners were determined that Lee would undertake the obligation to produce tin. It is consistent with that determination, brought on by prior years' frustrations, that Lee would be required to guarantee production by being obligated to deliver a specific tonnage of material to the washing plant each day, at the risk of forfeiting his interest in the claims if he failed to produce. The testimony of Dunbar, which was not contro-

verted to any material extent, supports such an interpretation. And so does the testimony of Lee himself in the important aspects we have mentioned.

Considering all of the circumstances surrounding the execution of the agreement in March 1965, we are convinced that the parties intended by the language in paragraph (3), not that Lee would simply have on hand during a mining season enough men and equipment capable of delivering 1,200 tons of material to the washing plant each day, but that such men and equipment would actually produce ore bearing material and deliver it to the plant in the amounts specified. In the light of these circumstances it would make little sense to have required that Lee merely provide enough men and equipment so as to be able to do a job, but to not require that the job actually be done. We believe the trial judge was mistaken in holding that it was not the intention of the parties that 1,200 tons of material be delivered to the washing plant each day. That was the intention of the contracting parties as we see it from the language they used, as clarified by all the relevant circumstances relating to the question of what was intended.

The trial judge found that during the 1965 mining season Lee had on hand sufficient men and equipment to deliver 1,200 tons of material to the washing plant each day. Appellant contends this finding was clearly erroneous.

■ Lee testified that it would take 10 men on each of two 10-hour shifts each day to deliver 1,200 tons of material. William O'Neill, a mining engineer and Lee's expert witness, testified that 15 or 16 men would be required. There was uncontradicted evidence that between July 25 and August 24, 1965 there were never more than seven men working on the claims, and that after August 24, no more than 11

—usually for only 10 hours a day. In the light of this evidence we hold that the trial judge was mistaken in finding there were sufficient men to comply with the 1,200 ton a day requirement. Such a finding was clearly erroneous.[4]

■ As to the sufficiency of the equipment, we reach a somewhat different conclusion. Lee admitted that the equipment was not sufficient prior to August 25, 1965, but stated that after that date there was enough equipment to deliver 1,200 tons of material to the washing plant each day. William O'Neill, Lee's expert witness, testified that according to his observation Lee had "ample equipment" on the mining claims "to handle the job that is necessary to be done." When asked whether the equipment was sufficient to deliver 1,200 tons of material to the plant each day, O'Neill said that it was "[i]f the ground was thawed and they could have it available." Guy Rivers, appellant's expert witness, testified that the equipment was insufficient to deliver such tonnage for any extensive period of time.

■ Since the evidence as to the sufficiency of the equipment was based on the testimony of witnesses and was in conflict, we must defer to the trial judge's function of judging the credibility of the witnesses and assessing the weight to be attached to their testimony.[5] As to the period after August 25, 1965 we cannot find that the judge's finding in this respect was clearly erroneous. But this does not mean that there was no ground for a forfeiture of appellees' interest under the contract. As we have held, Lee was required to deliver to the washing plant each day 1,200 tons of material, rather than merely having on hand equipment enough to do this job. Lee did not fulfill this requirement of the contract—his testimony being that during the entire 1965 mining season only 3,500 tons of material were delivered.

Fairbanks Publishing Co. v. Pitka, 445 P.2d 685, 687–688 (Alaska 1968).

5. *Id.* at 687.

4. A trial judge's finding of fact is clearly erroneous when we are left with the definite and firm conviction on the entire record that the judge was mistaken.

The concluding part of paragraph (3) of the agreement provided that:

> The obligations of Lee under this paragraph are subject to Acts of God, strikes or other matters over which he has no control.

The trial judge found that Lee had operated the mining claims in a good workmanlike manner. But then he found that even if there had been any failure of performance by Lee under the contract, he would be excused from performance by reason of unusually severe weather conditions which was a "matter over which he [Lee had] no control", within the meaning of the contract language. Appellant maintains this was error.

Lee testified that there was a "radical difference" between the weather during the summer of 1965 and prior years—that in 1965 "[t]he weather was the worst I have ever experienced in this country." Lee's father testified that the weather was very cold and that it "was freezing at night most of the time." Andrew Seetook, who worked for Lee for two weeks in September 1965, and who lived in Wales, Alaska, which is located about seven miles from the mining claims, said that the weather was "very unusual" and "very, very bad." Frank Oxereok, who also lived in Wales, stated that the summer of 1965 "was one of the worst summers I have ever seen. Wet, cold and all that * * *. Windy."

Appellant introduced into evidence Bureau of Mines Information Circular 7878 which showed the average temperatures and precipitation in Wales for 1959. In addition, appellant introduced the 1963 and 1965 United States Department of Commerce Weather Bureau "Annual Climatological Summaries" for the airport at Wales. A comparison of these reports showed that the temperatures in July, August and September of 1959, 1963 and 1965 were about equal. It also showed that the precipitation in 1965 was over twice as much as it was in either 1959 or 1963.

The subject that this phase of the case leads us into is impossibility of performance of a contractual obligation as affecting the rights of the contracting parties. Much has been written on this subject.[6] The view which the trial court seems to have adopted, in saying that Lee would be excused from nonperformance by reason of the fact that he was severely delayed and hampered by adverse weather conditions, is the rule of the Restatement of Contracts. There it is said that impossibility of performance of a contractual obligation includes not only strict impossibility but "impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."[7]

■ This is not an appropriate occasion to determine what rule on impossibility of performance should be adopted. The reason is that there is no evidence as to adverse weather conditions which specifically relates to Lee's ability or lack of ability to comply with the requirements of the contract. It has not been shown that the unusually heavy rainfall and the cold, windy and generally unpleasant weather in the summer of 1965 made it impossible, or even impracticable, to load trucks with ore bearing material and transport that material to the washing plant. We believe the trial judge was mistaken in holding that Lee would be excused from performance under the contract by a matter over which he had no control.

Paragraph (9) of the agreement provided:

> If Lee fails to keep and perform any of the agreements contained herein on his part to be kept and performed, then the Company may at its option forfeit all of Lee's interest in the said property by giving to him written notice of such forfeiture, and allowing Lee thirty days from

---

6. 6 S. Williston, Law of Contracts §§ 1931-79 (rev. ed. 1938); 6 A. Corbin, Contracts §§ 1320-72 (1962); Annot., 84 A.L.R.2d 12 (1962); Restatement of Contracts §§ 454-69 (1932).

7. Restatement of Contracts § 454 (1932).

date of such notice in which to remedy such failure, and in case such failure is remedied within thirty days, then the forfeiture will be avoided. If, however, such failures are not corrected within that period, then in that event Lee will quit the premises and surrender possession thereof to the Company at the end of said thirty-day period.

On October 5, 1965 appellant sent Lee a telegram which read as follows:

Understand Linda leaves for Nome tomorrow Wednesday. Suggest you take whatever equipment you will need in Nome-Solomon area next year because this telegram is official notification of forfieture [sic] of your interest in contract with Alaska Placer for non-performance of minimum requirements among other reasons. We will honor 30 and 90 day provisions.

As to the effect of this forfeiture, the trial judge stated:

However, the court does find that defendants have a large investment in time and money in these claims and that based upon the facts of this case it would be inequitable and unjust for the court to forfeit this contract of purchase in this case.

\*   \*   \*   \*   \*   \*

To allow the plaintiff to forfeit their sales contract with the defendants would cause a loss to the buyers all out of proportion to any injury which may be sustained by the sellers.

In refusing to allow the forfeiture under the express terms of the contract, the judge relied upon our decisions in Land Development, Inc. v. Padgett[8] and Jameson v. Wurtz.[9] The Padgett case involved an action to recover possession of property after default by the purchasers on an installment contract for the purchase of a home. The contract provided that if the buyers defaulted on any payments, all previous payments would be retained by the seller as rent and the buyers would be required to vacate the property. After the buyers had paid $9,500 on the purchase price, they defaulted with $2,435 remaining to be paid. The trial court refused to strictly enforce the forfeiture. It provided that the buyers' rights would be forfeited only if they failed to pay the accrued interest within one week, and the balance of the principal within three months. On appeal we held that the trial court was justified in refusing to enforce the forfeiture literally. We said:

In these circumstances, enforcement of the forfeiture would be inequitable; it would cause a loss to the buyers all out of proportion to any injury that might be sustained by the seller. The latter's rights were fully protected; for if the buyers failed to pay the balance owing by the time specified in the judgment, then their interest in the property would be entirely forfeited and the seller would regain possession. All the court did was to allow the buyers a limited opportunity to salvage, if they could, a substantial interest in the property acquired by them during the three-year period. To refuse them this period of grace would not be in accord with principles of equity and justice. [Footnotes omitted.] [10]

The Jameson case involved a similar factual situation, except that in Jameson the buyer had paid 88 percent of the purchase price before he defaulted. We followed our decision in Padgett and did not enforce the strict forfeiture but gave the buyer a reasonable grace period to remedy the default.[11]

These decisions are inapposite to the situation in this case. In Padgett the buyers had paid two-thirds of the purchase price before default, and in Jameson, 88 percent. Here the purchase price was $400,000, and

8. 369 P.2d 888 (Alaska 1962).

9. 396 P.2d 68 (Alaska 1964).

10. Land Development, Inc. v. Padgett, 369 P.2d 888, 889–890 (Alaska 1962).

11. Jameson v. Wurtz, 396 P.2d 68, 74–75 (Alaska 1964).

Lee had paid only $2,500 in cash and had executed a promissory note in appellant's favor for $5,000. It is true that in a letter dated June 30, 1965 from Lee's wife to Dunbar, appellant's representative, Mrs. Lee made cursory mention of "an investment of over 100,000.00 for the company", and said: "We have a 65000.00 loan to be paid off in 5 years, the contract with you * * * should at least be a protection for us for that period of time." But there was no other evidence indicating what the $100,000 "investment" consisted of, or what the $65,000 "loan" was used for, or whether the $65,000 was included as part of or was additional to the $100,000 investment.

■ All that the evidence shows appellant actually received on a $400,000 sales price was $2,500. The $5,000 note and the balance of the total price were to be paid from net receipts received from the production and sale of tin. There was no evidence that any such receipts were obtained, since it appeared that there was very little, if any, tin produced by Lee in 1965. Considering the very small percentage of the total purchase price paid by Lee, the fact that in prior years Lee had failed to put the mining claims in production, and the fact that appellant was counting on Lee to produce in 1965, which he did not do, we do not consider it inequitable to enforce the forfeiture clause of the contract according to its terms. In the cases involving the purchase of homes in *Padgett* and *Jameson,* the buyers had paid a very substantial portion of the purchase price and were given a reasonable time to pay the balance. Here a very insubstantial part of the purchase price had been paid, and based on the history of Lee's performance as a miner between 1960 and 1965 there is little justification for allowing him some additional time to make good on his contract.

■ The notice of forfeiture stated that Lee's interest was being forfeited "for non-performance of minimum requirements among other reasons." The trial judge held that this notice "did not outline exactly what the specific breach was and was too general in terms." We do not believe it was ineffective for that reason. It was clear enough from all of the circumstances leading up to the formation of the contract that Lee was primarily expected to produce tin, and in order to accomplish that, to deliver to the washing plant each day at least 1,200 tons of ore bearing material. It is also clear enough that Lee failed to do what was expected of him. In these circumstances Lee can hardly contend that he did not know what appellant meant by "non-performance of minimum requirements" in the notice of forfeiture.

■ The notice of forfeiture was given on or about October 6, 1965, the day Lee was leaving the claims at the end of the mining season. Since placer operations of the kind involved here could not be carried on after that date because of freezing conditions, the judge felt that the 30 days Lee was allowed by the contract to remedy his failure to perform should have extended into the next mining season commencing in the summer of 1966. The judge also indicated, although he did not expressly find, that the right to declare a forfeiture had been waived because Dunbar, appellant's representative, had visited the mining property in August 1965 and had said nothing to Lee indicating dissatisfaction with Lee's performance under the contract.

On June 30, 1965 Lee's wife, appellee Phyllis Lee, wrote to Dunbar informing him of difficulties they had encountered during May in getting in shape for travel a ship they were to use in transporting their mining equipment to the claims. She also wrote of the difficulties they were having in obtaining reliable workers. Dunbar replied by a letter to Mrs. Lee dated July 7, 1965. He stated that Lee had been aware of the condition of his ship long before May, that since Lee had lived all of his adult life in Alaska and had been in the mining business for a long time, the labor situation was well known to him, that knowing these things Lee had still agreed to the terms of the contract, that at the time the contract was executed Dunbar

had clearly stated to the Lees that "the time has come for the tin to come out and that 1965 was his [Lee's] last chance to produce", that "satisfactory performance this year is a must", and that it was Dunbar's obligation to see to it that the mining claims were operated in a businesslike and effective manner.

Mrs. Lee replied to Dunbar in her letter of July 11, 1965. Pertinent excerpts from this letter are:

Let me tell you how I feel about the Contract we signed. Any document that important shouldn't be railroaded through like this one was. * * * True we had you make what few changes we did. I still think it was an unfair advantage to rush the whole thing through like you did. We signed it and will have to abide by it, completely at your mercy if you want to call default after our efforts this year. * * *

\* \* \* \* \* \*

It is not my intent to offer any more excuses nor to promise any definite date of arrival to Tin City. * * * I have no doubt that we will get to Tin City and in production this season. We are not a bit worried about meeting our commitments this year. * * *

Now I will come to the most important thing that I have to say. Richard is allergic to too much pressure. This letter and yours I will put away for him to read when the work is all done this fall. Since you people and all of us are relying on Richard as the key man in this operation, it behooves us to keep him as healthy as we can. If he is under too much pressure he gets physically ill. He has a nervous stomach and a kind of arthritis that is crippling and is brought on by mental stress. The ordinary pressure of the work right now, when things don't go smoothly and more unforseen [sic] delays pop up is about all he can take. Kim's [12] presence here isn't help-

ing this situation at all. We (Kim and I) discussed this this morning. He realizes the situation and has agreed to make his reports as usual, but to avoid any thing that agrivates [sic] this pressure deal. We all should realize that a man can't do his best work or thinking when he isn't in top physical shape. This situation is quite new to him. He has always worked for himself with no major oritisism [sic]. He has his faults like you and I, but one of them isn't lack of effort.

As long as we signed the contract for a year, why don't we let it go at that and do our worrying and final analysis at the end of the season. Richard has always somehow managed to get through most difficulties with half a chance. * * *

At the trial Kirk Dunbar was asked what action he took after receiving Mrs. Lee's letter of July 11, 1965. He said that he wrote to his son, Kimball, and asked him to tell Mrs. Lee that he, Kirk Dunbar, "would not write any more of that kind of letters. Until the season was over." Kirk Dunbar arrived at the site of Lee's mining operations on August 29, 1965. At the trial he was asked if he had discussed with Lee his performance under the contract for that season. Dunbar replied: "No, sir, I was committed to Mrs. Lee not to discuss business with him [Mr. Lee] until the end of the season."

The appellees, Richard and Phyllis Lee, are in no position to argue that appellant's right to forfeiture was waived or that the notice of forfeiture came too late for the Lees to remedy their failure to perform during the 1965 mining season. It is true that Dunbar knew of Lee's failure to perform before October 1965. But the correspondence between Dunbar and Mrs. Lee, and Dunbar's testimony, shows that Dunbar held back on giving an earlier notice of forfeiture at Mrs. Lee's specific request not to bother her husband about the matter

---

12. "Kim" is Kimball Dunbar, the son of Kirk Dunbar. Kimball Dunbar worked for or was present with appellees during the 1965 mining season, and kept daily work reports which were sent to his father, Kirk Dunbar.

until the "work is all done this fall", and upon Mrs. Lee's assurances to Dunbar that the Lees would meet their commitments under the contract. In these circumstances it is not with good grace that the Lees now argue that appellant should have given earlier notice of forfeiture in order to be able to rely on the forfeiture provision of the contract.

This is not a case where appellant sat idly by, registered no objections, and then attempted to forfeit appellees' interest under the contract at a time when it was too late for appellees to remedy their failure to perform.[13] Appellant should not be penalized for acceding to Mrs. Lee's plea which in substance was not to give a notice of forfeiture at an earlier date. We find that there was not a waiver by appellant of its right of forfeiture under the contract. Nor did the notice of forfeiture come too late to be effective.

 Since the trial judge found that appellees were not in default under the contract, he held that appellant was not entitled to any relief on its complaint for an injunction. We do not know whether injunctive relief would have been granted if it had been found that appellees' interest in the contract had been forfeited. We shall pass upon that question here, even in the absence of a holding on the point by the trial judge, in order to finally dispose of this litigation and avoid the possibility of a further appeal on this point.

Paragraph (9) of the agreement provided that after forfeiture of Lee's interest in the property "Lee will quit the premises and surrender possession thereof to the

Company at the end of said thirty-day period." Appellant's complaint alleged that Lee refused to vacate the mining properties and notified appellant that he intended to continue mining operations.

 Appellees' failure to vacate the mining claims after forfeiture of their interest made them trespassers.[14] A remedy at law, by an action for damages brought by appellant, would be inadequate because the trespass is a continuing one and would entail repeated litigation. Appellant had a right to injunctive relief.[15]

The judgment is reversed and the case remanded for further proceedings consistent with the view expressed in this opinion.

---

13. See Cline v. Eastman, 5 Alaska 264, 268 (D.Alaska 1915).

14. Restatement (Second) of Torts § 158 (1965) provides in part:
   One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
   *     *     *     *     *
   (b) remains on the land. * * *
   Comment 1, at 280 states:

If the possessor of land has consented to the actor's presence on the land, his failure to leave after the expiration of the license is a trespass. * * *

15. Archer v. Greenville Sand & Gravel Co., 233 U.S. 60, 65, 34 S.Ct. 567, 58 L.Ed. 850, 852 (1914); Harris v. Krekler, 113 Ind.App. 190, 46 N.E.2d 267, 269 (1943); Hastings Oil Co. v. Texas Co., 149 Tex. 416, 234 S.W.2d 389, 398 (1950).