**NATIONAL BANK OF ALASKA, a National Banking Association, Appellant,**

v.

**J. B. L. & K. OF ALASKA, INC., a corporation, et al., Appellees.**

No. 2289.

Supreme Court of Alaska.

Jan. 28, 1976.

Robert J. Dickson, of Atkinson, Conway, Young, Bell & Gagnon, Anchorage, for appellant.

W. C. Arnold, Anchorage, for appellees.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BURKE, JJ.

ERWIN, Justice.

This action arises from a contract entered into by predecessors in interest of the present parties.[1] It was treated by the court below as a suit for an accounting, but the nature of the case is in dispute on this appeal.

Effective January 1, 1962, Kodiak Insurance and Building Corporation, an entity which was owned by the National Bank of Alaska as successor to the Bank of Kodiak, sold its insurance agency business to Arthur Brooks. Under the contract of sale, Brooks was required to pay:

> . . . an amount equal to 15% of the net retained commissions earned by the Buyer in the conduct of the insurance agency business during the ten-year period commencing on January 1, 1962, and ending on December 31, 1971. Such amounts shall be payable on or before the 15th day of each month based upon the net retained commissions earned during the immediately preceding month.

Brooks, the buyer, had managed the insurance agency business carried on by the Bank of Kodiak, through the entity of Kodiak Insurance and Building Corporation.

---

1. The contract basically provided:

. . . the Seller desires to sell the property used by it in conducting the insurance business and the good will thereof.

. . . . .

"Good Will" of the insurance business shall be defined to include the right to conduct the insurance agency business presently conducted by the Seller.

Brooks and Bernard Guhrke had formed Kodiak Insurance, Inc., to pursue the former insurance agency business of Kodiak Insurance and Building Corporation, and the new entity regularly made payments under Brooks' contract with Kodiak Insurance and Building Corporation.

In 1966 Kodiak Insurance and Building Corporation was dissolved and plaintiff NBA, as its corporate parent, acquired its interests, including the right to payments under the contract with Brooks. In 1967 defendant Jewett, Barton, Levy & Kern, a partnership, acquired the stock of Kodiak Insurance, Inc. (which had already undergone several previous transfers). It assumed the obligations of the previous purchase agreement, including payment of 15% of the net retained commissions earned by the agency.

Appellees' claim arises from the fact that NBA, from the time of its merger with the Bank of Kodiak, had been writing credit life insurance through its Kodiak Branch under an experience rating agreement with Olympic National Life Insurance Company of Seattle. The Bank received commissions on these sales. The original agreement selling the insurance business to Brooks had contained a covenant not to compete as follows:

> The Seller covenants with the Buyer that until December 31, 1971 the Seller will not engage in the insurance agency business on the Island of Kodiak, either directly or indirectly. The Seller further covenants that he will not during this period, directly, or indirectly, induce any of the former business clients to patronize any insurance agency other than the buyer.

Appellee Kodiak Insurance, Inc. succeeded to the benefit of this covenant.

The trial court granted plaintiff-appellant's prayer for money due and owing under the contract but offset it by 85% of the amount received by the Bank in commissions for credit life insurance, deeming the Bank to have violated the non-competition covenant.

Conflicting testimony was received regarding the technical meaning of the term "net retained commissions," but the court apparently did not consider extrinsic evidence relating to the parties' intentions under the covenant not to compete. The court described the action as one for an accounting and struck a balance between the contract payments due appellant and the breach in favor of appellee.

I. Admission of Extrinsic Evidence to Resolve an Ambiguous Term

Appellant asserts that error was committed in the trial court's decision not to consider the circumstances and usage surrounding the formation of the contract. It contends that the covenant not to compete was ambiguous, and therefore parol evidence relating to the parties' intent should be used in the interpretation of the contract.

This Court has repeatedly stated that, where a term in a written contract is ambiguous, extrinsic evidence of surrounding circumstances and usage may be admitted to aid in determining the intent of the parties and resolve the ambiguity.[2] All courts and commentators seem agreed upon this proposition. The converse proposition —that where a term is clear and unambiguous, the intent of the parties is to be ascertained solely from the written instru-

---

2. *Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 445 (Alaska 1974); *Hendricks v. Knik Supply, Inc.*, 522 P.2d 543, 546 (Alaska 1974); *Smalley v. Juneau Clinic Building Corp.*, 493 P.2d 1296, 1305 (Alaska 1969); *Port Valdez Company v. City of Valdez*, 437 P.2d 768, 771 (Alaska 1968); *Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Ins. Co.*, 407 P.2d 1009, 1013 (Alaska 1965). *See also United States v. F. D. Rich Co.*, 434 F.2d 855 (9th Cir. 1970); *Alaska Placer Company v. Lee*, 455 P.2d 218, 221 (Alaska 1969). See *Kupka & National Aero Sales Co. v. Morey*, Alaska, 541 P.2d 740 (1975), as to the use of extrinsic evidence in determining whether there has been an integration of the contract.

ment—has been recited by this Court[3] but appears to be in controversy both among commentators and in this Court's prior opinions.

Commentators deal with two aspects of the question: first, under the general standards of contract interpretation; and secondly, as a function of the parol evidence rule. As to the former, both Williston and Corbin identify several standards, most of which parallel the four standards enumerated by Wigmore. Wigmore stated these as follows:

1. The *popular* standard (the common meaning of words),

2. The *local* standard (to include particular usages of a business group, technical terms or local dialect),

3. The *mutual* standard (to include particular meanings understood by the parties to contract), and

4. The *individual* standard (reflecting the sense attributed to words by a single party).[4]

Williston adopts these standards, adding a fifth:

5. A standard of reasonable expectation, or the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party.[5]

Although he attempts to distinguish this latter concept, Williston concedes that it will provide generally the same result as the mutual standard, and finds it the most applicable to bilateral transactions.[6]

■ Because the agreement in question represents an integration,[7] the parol evidence rule provides some assistance in determining the applicable standard. Where there is an integration, the parol evidence rule, although a rule of law rather than interpretation, bars the introduction of extrinsic evidence to add to or vary the terms of the written agreement.[8] It thus fixes the integrated document itself as the subject matter for interpretation.[9] The question then becomes: to what extent may extrinsic evidence be used as an aid to interpretation?

This Court has provided apparently divergent responses to this question. It was stated in *Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Ins. Co.*[10] that

[w]e are in agreement with those authorities which hold that where the terms of a policy of insurance are clear and unambiguous, the intent of the parties must be ascertained from the instrument itself, and that where there is uncertainty or ambiguity, intent may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated. (footnote omitted)[11]

This rule was made applicable as well to non-insurance cases in *Port Valdez v. City of Valdez*,[12] where the above language was

---

3. *See Port Valdez Co. v. City of Valdez*, 437 P.2d 768, 771 (Alaska 1968); *Pepsi Cola Bottling Co. v. New Hampshire Ins. Co.*, 407 P.2d 1009, 1013 (Alaska 1965) (insurance contract).

4. IX J. Wigmore, Evidence, § 2460 (3d ed.) 1940.

5. 3 S. Williston, The Law of Contracts, § 603 (3d ed. Jaeger) (1961).

6. *Id.* The Restatement of Contracts severs the objective standard into two distinct standards: the reasonable meanings attached to a manifestation by (1) one making the manifestation and (2) one receiving it. Restatement of Contracts, § 227, Comment (a) (5) and (6) (1932).

7. Although no specific finding held the contract to be integrated, it is clear that the court so treated it. Neither party appears to challenge such a determination, although the resultant construction is in dispute.

8. *See* Restatement of Contracts, § 230 (1932).

9. 3 S. Williston, The Law of Contracts, § 603 (3d ed., Jaeger) 1961.

10. 407 P.2d 1009 (Alaska 1965).

11. 407 P.2d 1013.

12. 437 P.2d 768, 771 (Alaska 1968).

quoted in upholding a conveyancing agreement.[13]

However, in *Alaska Placer Company v. Lee,*[14] in an opinion by Justice Dimond, the Court appeared to adopt the view of Professor Corbin that all disputed language in a contract must be treated as ambiguous. The court stated:

> [S]eldom in a litigated case do the words of a contract convey one identical meaning to the two contracting parties or to third persons. Therefore, it is *invariably* necessary, before a court can give any meaning to the words of a contract and can select one meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that extrinsic evidence shall be heard to make the court aware of the "surrounding circumstances," including the persons, objects, and events to which the words can be applied and which caused the words to be used. (Emphasis added).[15]

This reference has generated confusion over the permissible use of extrinsic evidence in contract interpretation in Alaska.[16] This Court declined an opportunity to clarify the resultant confusion in *Day v. A & G Construction Co., Inc.*[17] where it found ambiguity to exist without resort to parol, then used evidence of the circumstances at the time of making to resolve the ambiguity.[18]

Appellant seeks to create order out of the confusion through an attempt to reconcile the holdings of the cases. Appellant suggests that ·evidence of the surrounding circumstances first be consulted to determine whether or not an ambiguity exists. If, in light of all the circumstances, the language of the contract appears to be capable of only a single meaning, the Court need not go beyond the instrument in a search for other possible constructions which either of the parties may have placed upon their agreement. If, however, in the light of its language and the circumstances surrounding the formation of the contract, any term appears capable of more than one meaning, those circumstances may be further consulted to ascertain which meaning lies within the intent of the parties.

This approach is not inconsistent with the views of secondary authorities. The Restatement proposes the following standard:

> The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person *acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration,* other than oral statements by the parties of what they intended it to mean. (Emphasis added).[19]

Williston, who, like the Restatement, espouses the "objective" standard, is in accord on this point.

> . . . [T]here must always be an association between words and external objects, and no matter how definite a contract may appear on its face, "words must be translated into things and facts." Thus . . . the contract in any event had to be appraised in view of the surrounding circumstances known to the parties at the time of its execution and

13. · *See also Smalley v. Juneau Clinic Building Corp.,* 493 P.2d 1296 (Alaska 1972).

·14. 455 P.2d 218 (Alaska 1969).

15. 455 P.2d at 221, *quoting* 3A A. Corbin, Contracts, § 536 (1960).

16. *See* Erwin, "Parol Evidence or not Parol Evidence in Alaska," 8 Alaska L.J. 20 (1970). *See also Kupka & National Aero Sales Co.*

*v. Morey,* Alaska, 541 P.2d 740 (1975), concerning the use of extrinsic evidence in determining whether there has been an integration of the contract.

17. 528 P.2d 440, 443, n. 4 (Alaska 1974).

18. *Id.* at 443–446.

19. Restatement of Contracts § 230 (1932).

these reasonably could be looked to without violating the parol evidence rule even though the contract were not deemed ambiguous. . . .[20]

Williston further suggests

. . . In interpreting contracts or clauses set forth in "clear and unambiguous" language, the courts do not confine themselves to a mere inspection of the document. Before committing themselves, the courts carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties. . . . (citations omitted)

. . . Only after a careful and painstaking search of all the factors shedding light on the intent of the parties, only after "turning signs and symbols into equivalent realities" will the court conclude that the language in any given case is "clear and unambiguous" (citations omitted).[21]

The Court in *Day* clearly adopted this "reasonable expectation" standard espoused by Williston and the Restatement.[22] The court stated

"[e]xpectation" or "understanding" standards allow substantially more leeway [than local standards] since a reasonable man is placed in the position of the parties, and the question is what he would reasonably expect that language to mean *under the circumstances.* (Emphasis added)[23]

We therefore conclude that appellant has correctly stated the law. But its statement

does not necessarily support its allegation of error.

The trial court appears to have followed precisely the procedure outlined by appellant in his brief to this Court. The case was tried to the court, which had available to it all of the evidence of circumstances known to the parties at the time they entered the contract. The Memorandum of Decision simply stated:

In deciding the above questions it must first be determined if there is ambiguity in the terms of the agreement, if there is no ambiguity the intent of the parties must be ascertained from the instrument itself. (citations omitted) I find no ambiguity in the terms of the agreement.

Appellant points to the above and to the court's later statement—

[i]n arriving at the decision that the sale of credit life insurance is prohibited by the covenant not to engage in the 'insurance agency business' I have considered the intent of the parties as manifest in the agreement. . . .

—in concluding that the court did not properly consider all the evidence in determining the existence of an ambiguity.

The court's statements may be viewed in a somewhat different light, however. The court suggested that the appellant's interpretation was unreasonable because of the reliance placed upon personal qualities of the buyer and the commitment of the buyer to pursue the business with vigor. The bank was selling all its right, title and interest to the physical assets and good will[24] used by it in engaging in the busi-

---

20. 3 S. Williston, The Law of Contracts, § 609 (1951), *quoting Nash v. Towne,* 72 U.S. 689, 5 Wall. 689, 18 L.Ed. 527 (1867), and *P. R. Company v. Denver & Rio Grande R. Company,* 143 U.S. 596, 12 S.Ct. 479, 36 L.Ed. 277 (1892), and *citing* the Restatement, *supra.*

21. 3 S. Williston, The Law of Contracts, § 600A (1961).

22. *Day v. A & G Construction Co.,* 528 P.2d 440, 445 (Alaska 1974).

23. 528 P.2d at 444.

24. The agreement specifically defined the terms "property" and "good will" as follows:

*Article II—Definitions.*
As used in this agreement:
1. "Property" shall be defined to include all of the tangible physical assets used by the Seller in the conduct of the insurance business, including furniture and fixtures, accounts receivable and premium note receivable, but not including cash on hand or on deposit, any real estate or improvements thereon, or good will.

ness of an insurance agency in Kodiak, Alaska, and all that remained was the name Kodiak Building and Insurance Corporation. The buyer agreed that he would not assign, transfer or sell that which he acquired without written consent of the bank, and that he would use his best efforts in the conduct of the insurance business throughout the period of the agreement.

In the addendum attached to the agreement, the bank agreed it would not engage in the insurance agency business on the Island of Kodiak, either directly or indirectly, and would not indirectly or directly induce any of its former business clients to patronize any insurance agency other than that of the buyer.

The covenant not to compete either directly or indirectly would become meaningless if it permitted the bank to compete but prohibited the shell, Kodiak Insurance and Building Corporation, from competing. The court thus clearly considered the likelihood that the buyer intended to have competition in any form from the bank inherently remote.

While the court was looking, to some extent, to surrounding circumstances in reaching its opinion, such an interpretation also arises from the language used and inferences therefrom, particularly when one considers the extent of statutory authorization to engage in an insurance agency business which existed at the time of the agreement.[25]

In reviewing the superior court's findings, it should be noted that this Court is not bound by the "clearly erroneous" standard applicable to factual findings made by the court. The evidence relating to the parties' situations at the time they entered the contract was not disputed. Where the facts relating to surrounding circumstances are not in dispute, interpretation of the words of the contract is treated in the same manner as questions of law, and the standard used in reviewing factual findings is inapplicable.[26] Nevertheless, we are of the opinion that the trial court was correct in its legal interpretation.

II. Modification

Appellant urges that, if the evidence of subsequent conduct is not dispositive of the parties' intent to construe the term "insurance agency business" in the noncompete clause to exclude the writing of credit life insurance, then the same evidence will show a subsequent modification of the contract.

While the parties' acts might normally be used to show subsequent modification,[27] the evidentiary facts are not present to demonstrate a modification in this case. The contract was a written one, as required by the statute of frauds,[28] because it was to be performed over a ten-year period. Not only was there no written modification,[29] but no oral agreement to modify appears. Appellant asks this Court to infer a modification solely

2. "Good Will" of the insurance business shall be defined to include the right to conduct the insurance agency business presently conducted by the Seller, its records, data, memoranda and information of expirations, books of account, good will, and all other information pertaining to the insurance business of the Seller.

.    .    .    .    .

25. See AS 21.09.010, requiring a certficate of authority to sell insurance; AS 21.09.070, setting up capital requirements for sellers; and AS 21.12.010–21.12.100, describing the types of insurance which could be sold.

26. *Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 443 (Alaska 1974); *Peters v.*

*Juneau-Douglas Girl Scout Council*, 519 P. 2d 826, 834 (Alaska 1974).

27. Restatement of Contracts, § 235, Comment (h) (1932).

28. AS 09.25.010(a)(1).

29. The Territory of Alaska's appellate court, the 9th Circuit, held in 1910 that oral modification of a written contract was possible. *Stanley v. Hemple*, 173 F. 61 (9th Cir. 1910). Absent statutory requirements, this is the rule at common law. *Stein v. Gable Park, Inc.*, 223 Or. 17, 353 P.2d 1034, 1038 (1960).

from the parties' conduct. Furthermore, no facts appear to show the required consideration was given for any modification. In the absence of some consideration for the alleged change, no modification has taken place.[30]

III. Waiver of Appellant's Breach

It is also contended that the facts revealed by the parties' performance under the contract amount to a waiver of NBA's breach, if any, of the covenant not to compete. NBA was shown to have been selling credit life insurance incident to its banking activities on Kodiak Island continuously since 1960.

■ The evidence shows that from the inception of the agreement, Bernard Guhrke, a vice-president of Kodiak Insurance, Inc., was aware that the Bank was selling credit life insurance. Arthur Brooks, the original purchaser, and later president of Kodiak Insurance, had reason to know the same facts as he had been employed in the bank's insurance department. The knowledge of these officers may be imputed to the corporation.[31] Despite knowledge of the facts giving rise to the present claim, the buyer and his successors regularly made payments under the contract for a period of nearly seven years without protest or objection to appellant's selling credit life insurance. It seems likely, however, that appellee's predecessors were unaware of the extent of their rights against appellant under those facts, as these rights are now asserted.

■ Waiver is the intentional relinquishment of a known right, and absent knowledge of its right or claim, a party cannot be said to have waived it.[32] The evidence does not lead to a clear conclusion one way or the other as to whether there was an intention to abandon these alleged rights. The trial court's memorandum decision does not discuss questions of waiver or estoppel although the issue was recognized during trial. However, it is clear from the entire decision that the court found the facts insufficient to bar appellee's assertion of claims arising from appellant's selling of credit life insurance.

In *Williams v. Stroh Plumbing and Electric*,[33] plaintiff asserted that defendant had, over a course of time, failed to respond to statements of account by plaintiff's assignor, and claimed this represented a waiver of defendant's account owing to plaintiff because there was a failure to assert this second account as an offset before plaintiff's action. The court there found such conduct, similar to that alleged here, insufficient to demonstrate an intention to waive the offset.

■ Because there appears little evidence of an intent to give up any rights or an intent that appellant should rely upon appellee's payments under the contract as absolution for its alleged breach of the non-compete clause, the court's apparent (though not explicit) conclusion regarding alleged waiver or asserted estoppel should be upheld.

IV. Appellees' Right to Affirmative Relief

Appellees' right to affirmative recovery is challenged under the provisions of AS 10.05.720, which provides, in part:

No domestic or foreign corporation may commence or maintain a suit, action or proceeding in a court in the state without alleging and proving that it has paid its annual corporation tax last due and

---

30. *See generally Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 94–95 (Alaska 1974).

31. *Beetschen v. Shell Pipeline Corp.*, 248 S.W.2d 66 (Mo.App.) *aff'd* 363 Mo. 751, 253 S.W.2d 785 (1962).

32. *Williams v. Stroh Plumbing and Electric*, 250 Iowa 599, 94 N.W.2d 750, 82 A.L.R. 2d 465 (1959) ; *Werking v. Amity Estates*,

*Inc.*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956) app. dism. 353 U.S. 933, 77 S.Ct. 812, 1 L.Ed.2d 756, reh. den. 353 U.S. 989, 77 S.Ct. 1281, 1 L.Ed.2d 1146 (1957).

33. 250 Iowa 599, 94 N.W.2d 750, 82 A.L.R. 2d 465 (1959).

has filed its annual report for the last calendar or fiscal year for which the report became due. . . .

██ ██ Jewett, Barton, Levy and Kern and J.B.L. & K. of Alaska, Inc. are parties to this action under an agreement to assume the obligations of Kodiak Insurance, Inc., but have no interest in Kodiak's claims. Thus, only Kodiak Insurance is entitled to enforce the covenant which it asserted at trial as a defense to NBA's action. The record discloses that Kodiak Insurance, Inc. suffered involuntary dissolution on November 6, 1972, for failure to pay its tax and file its annual report. It is thus clear that these acts were not performed for at least one year prior to November 6, 1972,[34] and that the corporation was in default of such performance at the time this action was initiated and at all subsequent times. Kodiak Insurance is thus brought within the rule denying the right to initiate or maintain an action or suit to a non-qualified corporation.

██ Where, as here, the party under such a disability is a defendant, his assertion of a counterclaim or set-off as a defense has not been treated as initiating or maintaining an action or suit. This Court recognized the distinction between plaintiffs and defendants by dictum in *Alaska Mines and Minerals, Inc. v. Alaska Industrial Board,*[35] where this court stated:

Appellant tries to escape the necessary results of its neglect by asserting that it was a defendant in the District Court, and therefore that the statutory prohibition is inapplicable. If appellant were a defendant in an action commenced in a court, its conclusion would be sound; for the statute is aimed only at a corporation that wishes to "commence or maintain" a proceeding, and not at one which defends against an action instituted by another.[36]

The *Alaska Mines* case did not distinguish, however, between the defendant who asserts a simple defense and one who, by counterclaim or offset, asserts a separate right to recovery against the plaintiff. No Alaska case has been located where this question has been considered.

Most cases which have considered the position of a counterclaim by a non-qualified corporation have permitted its assertion, but only to the extent necessary to offset plaintiff's claim. Two cases decided under a Washington statute similar to Alaska's are cited by appellant. In *North Star Trading Co. v. Alaska-Yukon-Pacific Exposition,*[37] a non-qualified corporate cross-complainant was permitted to answer and assert a cross-complaint as a setoff but was denied the right to affirmative relief.[38] The rule was followed in *Boston Towboat Co. v. John H. Sesnon Co.*[39] In the Alaska case of *Kiebsack v. Hearn,*[40] the superior court allowed a non-qualified corporation to state a counterclaim for less than plaintiff's claim, stating that affirmative recovery could not be had.

There is, however, a minority of states which appear to permit an affirmative recovery. Idaho, which has a statute penalizing non-qualification solely by injunction,[41] has limited capacity to sue by judicial decision. In *Burley Newspapers, Inc. v. Mist Publishing Co.,*[42] that state held its limitation not applicable to defendants asserting a counterclaim. No dicta appears in the opinion to limit defendant's affirmative recovery. A federal court in

34. *See* AS 10.05.519(a)(1).

35. 354 P.2d 376 (Alaska 1960).

36. 354 P.2d at 379.

37. 68 Wash. 457, 123 P. 605 (1912).

38. 123 P. at 606.

39. 199 F. 445 (W.D.Wash.1912).

40. No. 70–863 (3rd Judicial District, Alaska, Jan. 11, 1971) *as cited in* 9 Alaska L.J. 113 (1971).

41. Idaho Code, § 30–501.

42. 90 Idaho 515, 414 P.2d 460 (1966). The counterclaim asserted in *Burley* was one for foreclosure of a mortgage; thus, no question was raised as to the amount of recovery.

*Smith v. Kincaide* [43] construed a Mississippi statute to authorize a compulsory counterclaim, including affirmative recovery, although the statute barred a non-qualified corporation from being able to "bring or maintain any action or suit."[44] These cases have, in effect, treated the plaintiff's action in bringing suit as raising an estoppel to assert, or waiver of, the defect in capacity which would exist had the defendant initiated the proceedings.

It is clear from these cases that defendant Kodiak Insurance should be free to raise matters arising out of the contract at least as an offset. We, however, do not have to resolve these conflicting legal positions because of the nature of this case.

In the case at bar, defendants asserted a defense, not in the form of a counterclaim but as a demand for an accounting, which was the same relief prayed for by plaintiff-appellant NBA in its complaint. While NBA now contends that the action was simply one in contract and that defendant's failure to counterclaim precludes recovery of any sort, it is clear from the pleadings, the written memoranda presented at the trial, and the oral arguments of the parties that this is an afterthought.

The need for an accounting is generally rested upon one of three factors:

1. The existence of a fiduciary relationship requiring the defendant to account to the plaintiff,

2. The existence of mutual accounts or a single account of unusual complexity, or,

3. a need for discovery.[45]

The latter consideration would appear to be insignificant under modern procedural codes, since discovery is extensive in all civil actions. No fiduciary relationship existed between the parties.

However, the parties' claims are somewhat complex. The term "net retained commissions" had to be defined and its definition involved determinations of the items and amounts of items to be included in that definition. Expert testimony was required in deciding what, if any, commissions were due upon bad debts and accounts with the related Trinity Insurance Company. In regard to appellee's claim that they had overpaid in view of appellant's alleged breach of the non-competition covenant, determinations were necessary respecting the Bank's account under an insurance experience rating agreement with Olympic National Insurance Company and NBA's commissions for credit life insurance under that agreement.

The court heard the matter itself, taking expert testimony where required. Although the court did not refer the matter to a master or auditor,[46] it is clear that it treated the action as one for an accounting, and neither party objected to such treatment at trial.

The significance of the action's treatment as one in accounting is grounded in the equitable maxim that he who seeks equity must do equity. A prayer for an accounting implies an offer to pay whatever obligation complainant may have towards the defendant. Thus, if the balance is found in favor of the appellee, he may recover even in the absence of a counterclaim.[47]

### V. Measure of Damages

In its memorandum decision, the court awarded damages for breach of the cove-

43. 232 F.2d 306, 310 (5th Cir. 1956).

44. Miss.Code 1942, Ann. § 5319.

45. *Smith v. Howell*, 91 Or. 279, 176 P. 805, 812 (1918).

46. Reference to an auditor or master is the preferred procedure upon an accounting, but such reference is a matter of discretion with the court. *King v. Langham*, 272 Ala. 662, 133 So.2d 669, 670 (1961); *Baxter v. Krieger*, 157 Cal.App.2d 730, 321 P.2d 879, 881 (1958).

47. *Birt v. Birt*, 102 Ariz. 374, 430 P.2d 136 (1967); *Griffith v. Cooper*, 145 Colo. 439, 359 P.2d 360, 361 (1961); *Chapin v. Gritton*, 178 Cal.App.2d 551, 3 Cal.Rptr. 250, 260 (1960). See *Luckenbach S.S. Co. v. Norwegian Barque Thekla*, 266 U.S. 328, 340, 45 S.Ct. 112, 69 L.Ed. 313, 316 (1924).

nant not to compete by awarding the amount received by the Bank from its sales of credit life insurance, subtracting 15% of that figure as retained commissions which would have been paid to NBA anyway. Thus, the court, in effect, assumed that all profits gained by the appellant were profits lost to the appellee. Or, to state it another way, the court struck the balance in the accounting as though the parties had entered in a joint business venture.

Defendants below, appellees here, sought an accounting for overpayment of its obligation to defendant. At trial, it developed that the alleged overpayment occurred because NBA had received 15% of net retained commissions without offset for its alleged breach of the covenant not to compete. The measure of damages should be the usual measure for breach of the covenant, up to the amount of payments made by Kodiak Insurance.

■■ ■■ The measure for breach of a covenant not to compete is generally not the profits earned by the breaching party, but rather the lost profits of the party asserting the breach.[48] However, while the bank was asked for the information at the trial, the only information they supplied the court was the gross figures which were subsequently reduced by offset for bad accounts to reflect a net profit figure. Because this is an action for accounting by the bank, the bank had the burden of producing further evidence to reduce the net profit figure. By failing to produce any evidence, they clearly are not in a position to claim the trial court erred in using the figures they supplied.

Both parties appear to concede that the court erred in its calculation of prejudgment interest. The court simply cut appellees' calculation of interest in half. No accounting was made for the fact that, for the last three years of the operation of the agreement, there were also sums due appellant from appellees. Nor does the arbitrary cutting in half of appellees' proposed interest approximate the various time periods for which interest was due.

Additionally, in *Phillips v. State*,[49] this court stated that the 1965 amendment to AS 09.50.280

. . . evinces an intent that prejudgment interest be awarded more liberally than prior judicial interpretations of AS 45.45.010 would have called for. When the legislature determined that interest should run against the state from the time amounts were due, rather than from the time of entry of judgment, it did not draw any liquidated-unliquidated distinction such as were employed in previous decisions under AS 45.45.010. We believe this action on the legislature's part to be a manifestation of sound policy, for our own study of the problem has led us to the conclusion that the liquidated-unliquidated common law distinction lacks a persuasive rationale.

In noting that the failure to allow such prejudgment interest encourages litigation, the court made clear that "whenever any cause of action accrues . . . the amount later adjudicated as damages is immediately 'due' in the sense of AS 09.50.-280 and AS 45.45.010(a)."[50]

This has been consistently followed[51] and in *Davis v. Chisim*[52] was further re-

48. *Merager v. Turnbull*, 2 Wash.2d 711, 99 P.2d 434, 127 A.L.R. 1142 (1940). *See generally* cases annotated at 127 A.L.R. 1152. In *Dowling Supply & Equipment, Inc. v. City of Anchorage*, 490 P.2d 907 (Alaska 1973), it was held that absolute certainty in amount of damages for lost profits was not a prerequisite to recovery. However, some competent evidence as to amount must appear. 490 P.2d at 909. Here, there appears almost no evidence of the existence of actual damages.

49. 470 P.2d 266 (Alaska 1970).

50. *Id.* at 274.

51. *Fairbanks Builders, Inc. v. Morton De-Lima, Inc.*, 483 P.2d 194 (Alaska 1971); *Nordin Constr. Co. v. City of Nome*, 489 P.2d 455, 474 (Alaska 1971). *See Hedla v. McCool*, 476 F.2d 1223 (9th Cir. 1973).

52. 513 P.2d 475 (Alaska 1973).

fined to reflect that prejudgment interest was in the nature of compensation damages. The case characterized *Phillips* as stating that "in only the most unusual cases would prejudgment interest not be proper."[53]

■ While other jurisdictions (as noted by the trial court) hold that actions for accounting are in the nature of unliquidated claims not entitled to interest,[54] we are not persuaded to adopt such a view herein. We adhere to the view expressed in the *Phillips* line of cases and hold that prejudgment interest should have been awarded herein. On recomputing interest, this should be taken into consideration.

## VI. Award of Attorney's Fees without Motion or Hearing

■ Appellant challenges the award of attorney's fees pursuant to Civil Rule 82 (a) by the court without a motion or hearing. This court's recent opinion in *Urban Development Company v. Dekreon*[55] seems dispositive of the issue. By way of dicta, the court candidly stated:

Under Civil Rule 82(a), a trial judge may award attorney's fees without a formal motion . . . and without a hearing.[56]

The judgment of the superior court as modified is ordered affirmed.[57]

BOOCHEVER, J., not participating.

CONNOR, Justice (dissenting).

The majority opinion appears to conclude that the non-competition covenant in this case was unambiguous with respect to the sale of credit life insurance, and determines that such sales were included within the covenant's coverage. I respectfully dissent.

The covenant provided that until December 31, 1971,

"The Seller will not engage in the insurance agency business on the Island of Kodiak, either directly or indirectly."

The critical question is the meaning of the phrase "insurance agency business."

The non-competition covenant appears in an addendum to the contract of sale. The addendum is specifically appended to and made part of the main contract. Looking to that main contract, then, I note that the "good will' sold to Brooks in 1962 included "the right to conduct the insurance agency business *presently conducted* by the Seller . . . ." (emphasis added). At the time the contract was made the Kodiak Building & Insurance Corporation,[1] the seller, did not sell credit life insurance. Therefore the sale of credit life was not a business "presently conducted" by the agency sold to Brooks. Since in the main contract the attention of the parties was focused on the insurance agency business as then conducted by Kodiak Building & Insurance Corporation, it is not likely that they contemplated inclusion of credit life insurance in the term "insurance agency business" as used unmodified in the covenant.

The surrounding circumstances clarify this ambiguity.[2] While the sale of credit

---

53. *Id.* at 481.

54. *Stockton Theatres, Inc. v. Palermo*, 121 Cal.App.2d 616, 264 P.2d 74, 85 (1953) ; *Lumberman's Supply Co. v. Neal*, 189 Okl. 544, 119 P.2d 1017, 1018 (1941).

55. 526 P.2d 325 (Alaska 1974).

56. 526 P.2d at 329.

57. The superior court may wish to hold a further hearing to determine the exact amount of the new judgment.

1. The company was styled so in the contract. I note, however, that both appellant and

appellee refer to the company as the "Kodiak Insurance and Building Corporation."

2. I find no need in this case to confront the issue of whether "all the circumstances" must be examined to determine the existence of ambiguity. Since I would find the crucial phrase "insurance agency business" ambiguous within the contract itself, an examination of the surrounding circumstances is in order to the extent that it will aid in interpretation.

life was no part of the insurance agency business conducted by Kodiak Building & Insurance Corporation, the National Bank of Alaska did sell credit life through its loan department. Thus I would find that, in the context of the covenant, the sale of credit life insurance was considered part of the "banking business" rather than part of the "insurance agency business." In this belief I am fortified by the consideration that national banks are permitted to engage in this limited form of insurance sales, which are incident to banking transactions, by 12 U.S.C. §§ 24, 84, 371 and Comptroller of the Currency Ruling 7110.

Moreover, the evidence shows that Arthur F. Brooks, the original buyer of the insurance agency business, either knew or reasonably should have known that credit life insurance was not part of the "insurance agency business" sold under the contract. Additionally, the corporate successor to Brooks, through its officers, Brooks and Guhrke, had the same knowledge. Despite this knowledge, payments were made to the seller from 1962 until 1969 without any objection being made that the seller was selling credit life insurance.

Since there is no basic factual dispute concerning the surrounding circumstances, the questions pertaining to the meaning of contract terms are treated in the same manner as questions of law, and we are not bound by the "clearly erroneous" standard.[3] Thus I would find that the term "insurance agency business" is ambiguous within the terms of the contract. In light of the surrounding circumstances, I would find that the National Bank of Alaska's sale of credit life insurance did not constitute a breach of contract. I would reverse and remand for entry of judgment in favor of appellant on the counterclaim.

3. *Day v. A & G Constr. Co.,* 528 P.2d 440, 443 (Alaska 1974) ; *Peters v. Juneau-*